The Judges delivered their opinions.
Judge Carr.
This is an action of assumpsit, by the holder of. a negotiable note against the maker. It was a note made for the accommodation of the payees, who endorsed it in blank, and gave it to a broker to raise money on. lie sold it to Johnson at a discount of 3 per eent. a month. The statute of usury has been pleaded in various forms, and a special verdict found, which will be considered hereafter.
It has been a good deal the fashion of late, to decry the policy and justice of our laws, regulating the rate of interest. These considerations, I know, do not belong to us. It is our duty to give to every law an honest and manly support, whatever may be our opinion of its wisdom. It may be permitted to observe, however, that if the experience of ages, and the general opinion of mankind, deserve weight in legislation, their voice is in favor of usury laws. They have prevailed in all civilized countries, and in all time. Their object too is a humane one. In Brown v. Morris, Cowp. Rep. 792, Lord MANSFrEim says, “These statutes were made to protect needy and necessitous persons from the oppression of usurers and monied men, who are eager to take advantage of the distress of others; while they, on the other hand, from the pressure of their distress, are ready to come to any terms; and with their eyes open, not only break the law, but complete their ruin.” In Lowe v. Waller, Doug. 736, the same Judge says, “ The statute of usury was made to protect those who act with their eyes open;—to protect them against themselves. Upon this principle, it makes it penal for a man to take more than the fixed rate of interest; i! being well known, that the borrower., in distress, would agree to any terms.”
*336 The early. statutes against usury attempted to put it down, by legislating in detail against the various forms, which it from time to time assumed; and it is curious to trace the progress of the contest between the law, constantly attacking, and the usurer, ever ready with some new device to elude and baffle the pursuit. Sometimes a colourable risque was added to the loan, or it was disguised under the form of a post obit or bottomry bond; sometimes, what was called dry exchange. The borrower drew a bill on a fictitious person, supposed to reside abroad. The bill was never sent abroad, but protested for non-payment, and the borrower charged with exchange, re-exchange, and other expenses beyond legal interest. Sometimes stock was lent, or money in the funds, to be returned by the borrower at a future day, till which time he is charged with interest for more than the market price of the stock. Sometimes, by advancing money on a pretended partnership; by which means the lender gets exorbitant interest, under the pretext of partnership profits. Sometimes, by giving the loan the shape of the purchase of a life-annuity. Sometimes, by obtaining a beneficial lease, in considera» tion of a loan of money. Sometimes, by discounting notes and bills of exchange, under the cloak of a purchase and sale. These are a few of the thousand devices resorted to, for evasion of the usury laws. The Legislature, in their later statutes, giving up the vain pursuit of usury in its particular forms, and striking at the root of the evil, have forbidden the taking exorbitant interest directly or indirectly; thus throwing upon the ministers of the law, the duty of detecting and defeating every attempted evasion of it. Well may these ministers exclaim, quo teneam vultus mutantem Protea nodo? Yet are they bound to pursue this Proteus through all his changing forms; and the law has given' them ample powers.
In Barton’s Case, 5 Co. Rep. 70, it is said, e( If in truth, the contract be usurious, against the statute, no colours nor shews of words will serve, but the party may shew it, and *337 shall not, be concluded or estopped by any deed or any ather matter whatsoever, for the statute gives averment in such case.”
la Flayer v. Edwards, Cowp. 112, Lord Mansfield says, “The statute of 12th Anne, prohibits any body from taking, any how, on the loan of money, above 5 per cent. (6 with us) for forbearance of payment; and all contracts for any loan of money, goods, merchandize, &e. bearing interest above 5 per cent,, with an agreement for principal and interest, are null and void. It depends principally upon the contract’s being a loan, and the statute uses the words directly or indirectly. Therefore, in all questions, in whatever respect repugnant to the statute, we must get at the nature and substance of the transaction. The view of the parties must be ascertained to satisfy the Court that there is a loan and borrowing; and that the substance was, to borrow on the one part, and lend on the other; and where the real truth is a loan of money, the wit of man cannot find a shift to take it out of the statute. If the substance be a loan of money, nothing will protect the taking more than Sper cent.; and though the statute mention only for 'loan of monies, wares, merchandize, or other commodities,’ yet any other contrivance, if the substance of it be a loan, will come under the word indirectly.”
Again, in Lowe v. Waller, Doug. 736, Lord Mansfield says, “Before the statute of Henry 8th, all interest on money lent was prohibited by the common law, as it is now in Roman Catholic countries. This gave rise to many shifts and devices to evade the law. One, which was then most common, was provided against by that statute; but, the prohibition being confined to that particular sort of transaction, usurers were thereby put upon other contrivances; and experience taught the Legislature, in more modern statutes, not to particularize specific modes of usury, because that only led to evasion; but to enact, generally, that no shift should enable a man to take more than legal interest opon a loan. Therefore, the only qnes *338 tion in all cases like the present is, what is the real substance of the transaction, not what is the colour and form”
The correctness of these views I have never seen or heard doubted; and surely they tell us, that the usury laws are not to be construed strictly like penal statutes; but liberally, with a view to advance the remedy, and suppress the mischief. Every transaction is to be stripped of the covering, which ingenuity has thrown around it, and exposed in its nakedness. In this spirit, let us look at the special verdict before us, and see what was the real substance of the transaction.
Wilson fy Orr, and Whitworth fy Adams, were two mercantile houses, doing business in Petersburg. On the 10th of September, 1817, Wilson, the acting partner of his house, applied to Belches, a broker of the town, to know whether he could raise money for him; who answered, “yes, on good paper.” On the evening of the same day, Wilson sent a verbal message to Belches, to en-quire whether the names of Whitworth Yancey would do; but Belches not being at home, did not receive the message. On the 11th of September, Whitworth fy Yancey, for accommodation merely, made the note in question to Wilson Sc Orr, being a negotiable note in due form, purporting to be for value received, which was endorsed by Wilson fy Orr in blank, and on the day of its date delivered by Wilson to Belches, without stating what was the consideration, or why it'was made, but requesting him to get the money for it. Accordingly, Belches, as broker, sold the note to Johnson, a citizen of Petersbui'g, at 3 per cent, a month discount, but did not communicate to him any thing about the note, or the intention of the persons, or the names of the owners; and said nothing on the subject, except that he offered the note for sale; and without further conversation, it was purchased by Johnson, with his own (and not the broker’s) money, which he advanced at the said discount, without any questions asked, or infor *339 mation given. To my mind, these facts clearly prove, that “the real truth of the matter,” “the substance of the transaction,” between these parties, was a loan. A cover indeed is attempted, by assuming the form of a sale, and interposing the broker as a shield. But, it is a cobweb covering, too thin for disguise; a shield too weak for protection.
That the object of Wilson §■ Orr was a loan, the advance of money noiv for money to be paid in 60 days, is expressly proved, first, by their application to the broker to know if he could raise money for them; secondly, by delivering the note to him, with a request that he would get the money for it. Get the money how ? Why, in the way uniformly practised with such paper, by discounting it at usury. Can we doubt this for an instant? Do not the whole res gestee proclaim it ? Do we hear of any restriction on the broker ? No ! He was to raise the mo - ney. No doubt he understood the phrase. “ ’Twas his vocation.” He went instantly and discounted the note at the rate of 36 per cent, a year; and we hear no complaint of his having exceeded his powers. And can we suppose that Johnson was ignorant of all this; that he took it for a note which Wilson Orr had received of Whit~ worth 4' Yancey in the ordinary course of business, and which they meant bona fide to sell out and out? (Not that I think such ignorance would protect him;) but can we possibly suppose it ? I cannot. The facts found, the whole port and bearing of the broker and the buyer, proclaim to my understanding the buyer’s knowledge of the real transaction, just as distinctly as if it had been found in so many words. It is expressly found that Belches sold the note as broker. This negatives at once the idea that Johnson could have dealt with him as owner. A broker is the factor of another; the agent of him for whom he is doing business at the time. Dealing with him in this character, if Johnson did not ask for whom he was acting, this wilful and designed omission charges him as strongly *340 with the fact and its consequences, as if it had been fully declared to him; and in truth, proves to my mind his knowledge of it. The broker offered the note for sale, the buyer took it, and paid his money without a question asked, or a word of explanation. Of this cautious silence of the parties, it may be truly said, qui facet clamat. It speaks most emphatically to my mind. Who ever heard of a sale conducted in this way, where there was no consciousness of guilt, no apprehension of danger from the law, but all was fair and above board ? In such cases, the seller fearlessly proclaims the title and circumstances of the property; and he who is about to vest his money in it, is eager to search out every fact connected with or bearing upon it. But here, conscious that they were doing a deed which the law would reprobate, and that their safety depended on concealment, we see them, in the very birth of the transaction, cautiously stifling the evidence, and preparing, by anticipation, the defence on which they now rely. They acted perfectly in concert. I ask no better proof that there was a secret understanding between them. In a special verdict, the jury need not find the usury. They find the facts, and the law infers the usury. Roberts v. Tremayne, Cro. Jac. 507; Chesterfield v. Jansen, 2 Ves. 147; Gibson v. Fristoe, 2 Call, 62; Marsh v. Martindale, 3 Bos. & Pull. 153. The finding proves to me, that the note was made and endorsed to raise money at usury, and that. Johnson purchased with notice of these facts. If my understanding of the verdict be correct, the conclusion of law is inevitable, that the note was void in its inception. Young v. Wright, 1 Camp. 141; Comyn on Usury, 172; 15 Johns. Rep. 44, 355.
But, if I should be wrong in this, there are two other grounds, on which, it seems to me, that the appellants must succeed.
1. This being accommodation paper, was never an available negotiable note, until it was discounted by Johnson ; and that discount being at a premium higher than the le» *341 gal rale, the note was usurious and void; and this, though Johnson did not know that it was accommodation paper,
2. Though the note should be considered perfect and available as between Wilson %■ Orr, and Whitworth S>Yancey, yet as the transaction by which it passed from tin; payees to Johnson, was a discount beyond legal interest, and so usurious, no subsequent holder could maintain an action on it.
As to the first: That a note, usurious in its creation, is void, into whose hands soever it may pass, is agreed on all 'sides. It is equally well settled, that if Jl. execute his note or draw his bill of exchange, and B. take these of him or his known agent, at a discount beyond the legal rate, it is just as much usury, as if B. had first advanced the mone.y, and then taken the bill or note to secure it. The shift of a pretended sale is not suffered to protect such a transaction for a moment. The acts of the parties speak, and this language is much more worthy of trust than words. There must be two parties to every contract. I may draw any number of promissory notes, payable to «/?., B., C., &c. and finish them all in due form. While I keep them in my desk or my pocket, they impose no obligation; they are waste paper merely. So, if I agree to purchase property for which I am to give $ 1000, and bond with three or four sureties is required; I execute my bonds, and get my friends to sign as sureties; this is still a one-sided, imperfect transaction. The bond as yet binds nobody; there is no contract; it is the delivery which gives it life. Suppose, instead of a bond, the vendor preferred to take a promissory note with Jt., B, and C. as sureties. 1 could execute the note payable to J1 and get him B. and C. to endorse it. This would make them, in truth, security for me, just as effectually, as if they had joined me in executing the bond. Or, suppose the obligation took the form of a bill of exchange. I might draw on JL payable to my own order; he would accept; then I would endorse it; and B. and C. would endorse after me. Still the note or hill. *342 while in my hands, would be mere waste paper. A., B. and C. to be sure, had agreed to become my sureties, and had signed the instruments in such a way, as to put it in my power to bind them; but they could only be bound when I became bound, and that could only be, when I delivered the note or bill, upon a real transaction. If I never did this, though the time for which the note purported to run had elapsed, no one of the parties to it could sustain any action on it, against another. It had never received the animating touch, and was still a lifeless body. So, if I wish to raise money at usury, a little caution must be used; a decent cloak. I get a friend to lend me his credit; he executes a note to me for $ 1000, payable in 3 months, which I endorse. While I hold this paper, it is nothing; it imposes no obligation on my friend; it is a mere preparation which I am making to get money. When I part with it, then I give it being, and stamp its character, by the nature of the contract I make. If I discount it beyond the legal rate, whether by myself or agent, it is usury. The note is usurious in its inception, and void.
To prove that the bill or note dates its existence from the first real transaction, I will first cite some English Cases.
In Arden v. Watkins, 3 East, 317, re-considered in Wills v. Freeman, 12 East, 656, A. having committed a secret act of bankruptcy, prevailed on B., for his accommodation, to accept a bill of exchange, which A. drew on him, payable to his own order. This bill A. endorsed to C. for a valuable consideration, and without knowledge of the act of bankruptcy committed by A., C. the endorsee sued B. the acceptor. It was contended for the defendant, that the property of the bill was in the assignees of the bankrupt, as his act of bankruptcy over-reached the endorsement. But the Court held, that the bill being accepted for accommodation of A. he had no property in it, nor right of action as against the acceptor; and therefore, that none could pass from him to his assignees; but, that *343 the endorsee for value might well maintain an action against the acceptor. This I consider a decision, that the bill, while in the hands of dl. was waste paper, and only ceived its existence as a bill, by the endorsement for value.
In Wallace v. Hardacre, 1 Camp. 45, the same point is decided upon the same reasoning. But, the ease most strong and decisive, on this subject, is Downs v. Richardson, 5 Barn, and Alderson, 657, and 7th Com. Law Rep. 227, decided in 1822. Three persons, Rains, Lachlan and Thompson, joined as drawer, acceptor and first endorser, in making an accommodation bill. The bill was properly stamped in the first instance; but afterwards, and before it was passed away for value, the date was changed from the 6th to the 16th of March. The acceptor agreed to this change; but afterwards becoming bankrupt, his assignees set up the defence, that the change of date made the bill a new one; and rendered another stamp necessary. Abbot, C. J, says, “The difficulty arises from the act of Parliament, which requires that every bill of exchange shall have a stamp. The question then is, whether this alteration made it a new bill ? Now undoubtedly, when an accommodation bill has the names of the different parties written upon it, it is, in some sense of the word, a bill of exchange; but it is utterly unavailable as a security for money, until it is issued to some real holder for a valuable consideration. It seems to me, on the facts of this case, that this was an accommodation bill, in the strictest sense of the word; and that the principal parties to it had no right of action inter se. This being the nature of the instrument, it follows that until it was negotiated, it was an unavailable instrument; and that it first became a bill of exchange, when it was issued to Howell fora valuable consideration. ” Rayley, J. “The question arises as to the provisions of the Stamp Ant. Now, if an alteration be made before a bill is issued, a fresh stamp is not necessary. Then, when is a bill issued? I am of opinion, that It is Issued as soon as there is some person *344 who can make a valid claim upon it; but, if it remains in the hands of the original drawer, even with names upon it, under such circumstances as that he cannot have any legal claim upon those persons, the bill is not issued. Here it was clearly an accommodation bill drawn by Rains upon Thompson, and endorsed by Lachlan, and those parties could not have a valid claim upon it inter se. It was, I think, not issued, until the 10th of April, when it was passed to Howard; but at that time, the alteration was made. ” Holroyd and Best were of the same opinion. The latter says, “ Here, at the time when the alteration was made, the bill was a perfect bill in form, but it did not constitute a valid contract between the parties. A bond is, in form, a perfect instrument, before delivery; but still an alteration made before delivery, will not vitiate it.” This is a very strong authority, when we consider how exceedingly strict the Courts in England are, in looking to, and preventing evasions of, the revenue laws.
Bowman v. Nichol, 5 Term Rep. 537; Cardwell v. Martin, 9 East’s Rep. 190; Bathe v. Taylor, 15 East, 412, shew, that after a bill of exchange is once perfected, the slightest alteration in it, even though all parties consent, will render it void, unless there be a fresh stamp.
I will also refer to the Cases in New York on this point. The commercial habits of that State have rendered them perfectly familiar with the subject. It is every day before their Courts; and their decision's seem to me to deserve all the weight which can be derived from learning, talents and diligent investigation, both in the bar and bench.
Jones v. Hake, 2 Johns. Cas. 60, A. made a note payable to B., which was endorsed by B. and C. for accommodation of A., and sent by him to E., a money broker, to raise money. E. returned the note, saying he could not get the money with the names then on it, but if D. were added, he could get it at 3 per cent, a month. A. then got B’s name, and returned it to E., who advanced the money on the note, deducting 2per cent, a month. In *345 an action against the first endorser by G., it was ruled at Nisi Prius, that the note was usurious and void. The jury, however, gave a verdict for the plaintiff, and there was a motion for a new trial. Radceiffe, J. said, “If the contract be viewed in its true light, it was a contract made through the agency of the broker, between A. on the one part, and the lender on the other, who took the note as his security. The lender was, in fact, the first holder of the note, for the value given, whatever that may have been. If, then, we admit no shift or device to evade the statute, and look through the forms under which the parties intended to cover the loan, it appears to me that there can be no doubt that the contract and the note are void.” Kent and Benson concurred. Lansing and Lewis against the new trial.
Wilkie v. Roosevelt, 3 Johns. Cas. 66. A. made a note payable to B., who endorsed it for A’s accommodation, who passed it to C., to raise money on, by discounting in the market. C. discounted the note at 3^ per cent, a month, and applied the proceeds to the payment of monies lent by him to A.; and afterwards, in the course of his bu - siness, passed the note to D., who sued B., the endorser. Held, that though B. had endorsed, yet as this was for A’s accommodation, the note passed immediately from A. to C.; and that the transaction was, in its inception, usurious, and void.
Mann v. The Commission Company, 15 Johns. Rep, 44. Herman Ruggles drew a bill of exchange, in favor of Oliver Ruggles or order, on Darling, the agent of the defendants. The bill was accepted by Darling, and endorsed by 0. Ruggles. The plaintiff was the holder of the bill. It appeared in evidence, that O. Ruggles had given the note to a broker to raise money on, and that it had been sold to the plaintiff, at a discount beyond the legal rate. Two points were made in the cause. The second was, that there was usury in the sale of the bill. Spencee, J. delivered the opinion of the Court, He said *346 that there had been considerable doubt in the minds of some of the Judges, principally with respect to the part which O. Buggies had played, whether he had a real interest, and could, after the acceptance of the bill, have maintained a suit upon it. “ This (he remarks) appears to the Court the true test in distinguishing between a case, where the discount of a bill at a higher premium than the legal rate of interest, will render the transaction legal, by considering it the purchase of a bill already perfect and available to the party holding it, and where it will be illegal as an usurious loan of money.” He then goes on to state it as settled law, that a bill, free from usury in its creation, and available to the holder, may be sold at a discount greater than the legal rate, without usury, and assigns the reason. “And I take it (he adds) to be equally clear, that if a bill or note be made for the purpose of raising money upon it, and it is discounted at a higher premium than the legal rate of interest, and Where none of the parties, whose names are on it, can, as between themselves, maintain a suit on the bill when it becomes mature, provided it had not been discounted, that then such discounting of the bill would be usurious, and the bill would be void.”
Bennett v. Smith, 15 Johns. Rep. 355. A. applied to B. to lend him money. B. refused, but said he would buy good notes at a discount of 21 per cent. A few days after, A. brought B. several notes executed by the defendants to A., which B. bought at a discount of 21 per cent., not knowing at the time but that the notes were given to A. in the ordinary course of business. The fact was, that they were executed to A. by the defendants (as a loan of their names) to be sold to B. at the discount he had offered. The Judge charged the jury, that if they believed the witnesses, the transaction was usurious, and the notes void, under the statute: that it was immaterial whether B. knew the manner in which A. obtained the notes; he took them at his peril, and though he may have supposed them to *347 have been given in the ordinary course of business, they were nevertheless void. The plaintiff was non-suited; and upon a motion to set the non-suit aside, on the ground that there was no usury, the Court overruled the motion, as a clear matter; Vann Ness, J. saying to the counsel, u The case of Mann v. The Commission Company is decisively against you upon this point. We decided, that a note made for the purpose of being discounted at an usurious interest, and endorsed for the accommodation of the maker, was void in its original formation.”
Powell v. Waters, 17 Johns. Rep. 176. Wood, made a promissory note, which Waters endorsed for Wood’s accommodation. It was made to be discounted at the New-burg Bank, and for this purpose was delivered to Smith, who also endorsed for Wood’s accommodation. Smith applied to the Bank, who refused to discount. He then called on one of the firm of J. T. Powell, who discounted the note, being informed of the purpose for which it was made. The note on which the suit was brought, was a second note made by Wood, and endorsed by Waters, for the purpose of taking up the former. Waters did not know, when ho endorsed the second note, that the first had been discounted by Powell 8? Co., and not by the Newburg Bank; and he supposed that the second note would go to that Bank to take up the former. The second note was discounted by Poioell 8? Co., and the first taken up with the proceeds. On this second note, Powell 8? Co. brought assumpsit against Waters. There were several minor questions; but the important one was, as to the usury in discounting the note. A verdict was taken for the plaintiffs, subject to the opinion of the Court on the case stated. Spencer, C. J. delivered the opinion of the Court He considered it of no importance that the note was intended to be discounted at the Bank, and was in fact discounted by Powell 8Co. It was made to raise money, and such discount did not increase or alter the responsibility of the endorser. On the question «f usury, he say?; *348 “ Tt may be urged that the purchase of the note by the plaintiffs at such a discount, as would amount to usury in case the note was originally intended to be sold to them, is not, under the circumstances, usurious, and in fact, that it was the mere purchase of a note at a less sum than its face. The case of Mann v. The Commission Company settles this point. It is there said, that if a bill or note be made for the purpose of raising money, and is discounted at a higher premium than the legal rate of interest, and none of the parties whose names are on it, as between themselves, can maintain a suit on the bill at maturity, provided it had not been discounted, that then such discounting would be usurious and the bill void. In the present case, the note was discounted for the accommodation of Wood, and it was not an available paper in the hands of either the payee or endorser, until it had been negotiated to the plaintiffs; and the transaction, therefore, would be usurious, if the plaintiffs purchased the note at a less sum than its nominal amount, deducting the interest for the time the note had to run.” A new trial was awarded.
These cases are all in point, and, I think, settled on clear grounds of law and reason. The last is a much stronger case than the one at bar. It is clear that Wood made the note and Waters endorsed it, with the intention of discounting it at the bank, and of course, at the legal rate. But yet, as the contract which gave it being as an available note, was a discount at a premium higher than the legal rate, it was usurious, and the note void. In our case, the note was made and endorsed for the express purpose of raising money at usury; and Wilson <§* Orr, through the broker Belches, sold it to Johnson, at a discount of 36 per cent, a year. If a shift so gross and palpable as this be suffered to pass as an innocent transaction, then indeed I should be inclined to think it best to repeal at once the statute against usury. Such a step would, at least, give fair notice to our citizens, of the ground they occupied.
*349 I said that the transaction would be usurious, and the note void, though Johnson did not know that it was aecommodation paper. I am met here by the objection, that there must be a corrupt agreement to constitute usury; and that there could be no such agreement, without the concurrence of two minds, in the commission of some act in violation of the law. This seems to have been the consideration which principally weighed in Taylor v. Bruce, Gilm. 42. I have, therefore, felt myself bound to examine this point, with my best attention.
In the first place, it does appear to me that there is much good sense and soundness in the construction of the statute, contended for by the counsel in Taylor v. Bruce, and used also by counsel in a later case in New York, 2 Cowan's Rep. 740, to wit, that there is a material distinction between that part of the statute, which avoids notes, assurances, &c. for usury, and that which subjects a party to the pains and penalties of the law. The first declares that no one shall take directly or indirectly, for loan of money, &c. more than 6 per cent, and all bonds, assurances, &c. by which a higher interest is reserved or taken, shall be void. The second enacts, that if any one shall, by corrupt bargain, loan, exchange, shift, &c. receive more than 6‘per cent, he shall forfeit double, &c. In the first clause, no corrupt bargain is made necessary to the avoidance of assurances. In the second, it is expressly required to constitute the offence. If we had to pass upon this subject for the first time, I think we should feel little difficulty in pronouncing, that there wás a substantial difference between them. Even in England, where under the influence of the statute of Hen. 8th, the corrupt agreement is said to be necessary to constitute usury, in both its branches; there is in fact a marked distinction between avoiding a note, Sic. and subjecting a party to the penalties of the act. For instance, in Barnett v. Tompkins, Skinn. Rep. 348, the wife of the plaintiff used to lend money, to be paid by the week. She lent to the defendant 20/. to be paid by *350 20 shillings a week, and Is. 6d. per week for interest. The sued on this bond. Lord Ch. J. Holt ruled, that it was an usurious contract, and that though it was not sufficient to charge the husband criminaliter, it was sufficient to discharge the bond civiliter.
Again. As to the corrupt intent, although it be necessary in England to lay it in the pleadings, they seem to have dispensed with any proof of an actual corrupt intent, by substituting for it a legal corrupt intent, saying that wherever any act is done, which shall be considered a violation of the statute, it shall be taken to be corruptly done, though the party had not the least idea, that he was offending against the law. They make a distinction very properly in this respect, between a mistake of fact, and a mistake of law. Thus, a bond is meant to be taken for the proper sum, and the scrivener mistakes it, and puts down a larger sum. This shall not avoid the obligation, or make the contract usurious. The most authoritative decision on this subject in England, and one which is there considered as having settled the law, is the case of Marsh v. Martindale, 3 Bos. & Pull. 154. The opinion of the Court is delivered by Lord Alvanley, C. J. and is elaborate and able. The jury had expressly found, (after stating the facts) that they believed the plaintiff Marsh did not think he was acting contrary to law. In the course of his opinion Lord Alvanley says, “I stated to the jury, that if a man agree to take more than 5 per cent, for the forbearance of money, the law declares such an agreement corrupt within the statute of Anne, whether the party thought at the time, that he was acting contrary to the statute, or not; and though the jury have found that Sir Charles Marsh did not think he was acting contrary to law, there is nothing in that finding to prevent us from examining the transaction, and declaring it to be corrupt, if it appear to us to be so in point of law, without sending the case back to a jury to find the corruption.” And accordingly the transaction was declared usurious, and the *351 bond void. This is the construction of equity, as well as , ■ law.
Bernards v. Young, 17 Ves. 44. A .case was brought before Sir Wxljlxam Grant, involving the question of usury. He discusses the subject with his usual dearness, and concludes thus; ^Therefore, though it was not probably so intended, this is an usurious contract.” These opinions seem to me to be founded in sound reason; and without such construction, it would be impossible to enforce the statute.
The Courts of Massachusetts and New York have, 1 find, acted upon this as a settled principle. Thus, in The Bank of Maine v. Butts, 9 Mass. Rep. 49, usury was relied on as a defence to a claim of the Bank, on notes discounted. The mode of discounting pursued was this: Notes payable at 63 days were discounted at the legal rate; but a week before the expiration of the time, the borrower was obliged to procure a new loan of the Bank; thus pay - ing for that week interest both on the original and the renewed loan. The Judge who tried the cause, instructed the jury, that this was not usury, as there was no corrupt. intent, the Bank believing that they had a right to ealeu late in this way. On exceptions to this opinion, the Court decided that the Judge had misdirected the jury. They say, isIt is probable, that in this ease, there was no intentional deviation on the part of the Bank, but a mistake of their right. This, however, is a consideration which musí not influence our decision. The mistake was not involuntary, as a miscalculation might be considered, where an intention of conforming to the legal rate of interest was proved; but a voluntary departure from that rate. An excess of interest was intentionally taken, upon a mistaken supposition that Banks were privileged in this respect, to a certain extent. This was, therefore, in the sense of the law, a corrupt agreement, for ignorance of the law will sol excuse,, ”
*352 New York Firemen Insurance Company v. Ely, 2 Cow. Rep. 678. The plaintiffs had discounted a note for the defendant. In a suit on the note, the defence was usu-VY- ^ came out in evidence, that the company, in their calculations upon discounting notes, were in the practice of taking 90 days as a quarter of a year, 60 days as a sixth, and 30 days as a twelfth; thus making the year to consist of 360 days, and gaining five days to the Bank. It was admitted that this was the general rule of the Banks of the State, and that the plaintiffs, in following this rule, had no idea of violating the law. But, the Court decided that the transaction was usurious, and the notes void, Southerland J. says, “There can be no usury without an intention to take a greater rate of interest than 7per cent. (6 with us,) but it is not necessary to the offence that there should be an actual intention to violate the statute. It may be committed by one who never heard of the statute. Whether the party intended to take more than 7per cent., is a question of fact for the jury. If it be found that he did, it is an invariable inference of law, that it was taken in pursuance of a corrupt agreement which consummates the of-fence. The intent of the parties is a legal inference from established facts. In a special verdict, it is not necessary that the jury should find that the agreement was corrupt. They find the facts and circumstances, from which the law infers either that it was or was not corrupt.” See also The Bank of Utica v. Wager, 2 Cow. Rep. 712, where the same points were raised, and settled in the same way, after arguments (of the bar) ámong the very ablest I have ever seen.
These cases shew, that there may be a legal intention, as contradistinguished from an actual intention, a corrupt agreement in law where there was no corruption in fact, as there may be fraud in law involving no moral turpitude. These legal conclusions are correct in the main, though there may be individual exceptions. They have been found necessary for the protection of the community, and *353 the execution of the laws, and cannot be safely departed jp aIOTHu
Having thus shewn, first, that to discount a note given for accommodation, at a higher rate than 6per cent., is a violation of the statute and usurious; and secondly, that every agreement in violation of the statute is per se a corrupt agreementj I think the conclusion follows, that Johnson, who purchased the note at a discount of 36 per cent, per annum, (which note received its existence by the transaction) has violated the law, and stands convicted of the corrupt agreement, though he did not know the note to be accommodation paper. It is supposed (in Taylor v. Bruce,) to be absurd and impossible, that when a man has purchased two notes, under precisely the same circumstances, the one shall turn out to be a fair and legal transaction, and the other an usurious and illegal transaction, The seeming absurdity results from considering actual corruption, moral turpitude, a necessary ingredient in the composition of usury civiliter, instead of that legal corruption, of which I have shewn the necessity from reason, and the existence, from authority. The hardship is not greater than where a man purchasing in the market two available, perfect notes, under the same circumstances, shall find one turn out to be a good note, given for a valuable consideration, and the other tainted in its origin with usury or gaming. The notes, in either ease, have no earmark; they bear no brand on their forehead. These, therefore, are the risks and hazards of the trade, and must be encountered by those who follow it. But these traders know (none so well S) that there is a great mass of accommodation paper made aad thrown into the market, to raise money at usury. They know (or if not, ignorance of the law excuses no man) that it is usury to buy these, at a discount beyond 6 per cent. Let them, therefore, make such enquiries as will satisfy them; or, if there be any doubt, let them avoid the traffic, or be content with the legal discount.
*354 Surely this cannot be requiring too much, in a class of cases, to which (as I think) the rule caveat emptor most appropriately and emphatically applies. Even if this restriction should narrow a little the range of this trade, is it not better, than, by freeing it from all restraint, to open a door for the evasion of the statute, so wide, that all who wish it, every necessitous borrower and grasping usurer, may enter at it ?
If it be objected, that the contract between the broker and Johnson was not usurious, because a note may be sold in the market for less than its face, without committing usury, I answer, that is very true, provided it be a real, bona fide, fair sale out and out of a note, perfect and available before such sale. But, between such a sale and the transaction here, there is a broad and marked distinction. If the holder of a note transfer it without endorsing it, the transaction is prima facie a sale; and if it be a real sale, and not a cover to evade the statute, the contract will be valid, though the discount be greater than the legal rate. But if the holder, when he parts with the note, endorses it, it becomes substantially a mere security for money borrowed. Upon a sale without endorsement, the seller enters into no engagement to re-pay the purchase money, nor is he liable in any event, if he has committed no fraud. In such a sale there can be no usury. But when he endorses the note, he binds himself absolutely, that the whole amount of it (the sum he receives, as well as the discount) shall be re-paid to the endorsee or holder; and being thus bound to pay money in future, for money advanced, if the discount be beyond the legal rate, is it not equally usury, whether the obligation to pay be incurred by an original note, or an endorsement? The difference between the discounting a bill, when the holder endorses, and the sale of a bill without endorsement, is very strongly and clearly laid down by the whole Court in Fenn v. Harrison, 3 Term Rep. 757. It would be a waste of time to refer to all the cases which shew, that where the note is endorsed *355 and discounted at a rate beyond the legal interest, it is usury. The books, both English and American, are full of them. Rich v. Topping, 1 Esp. Rep. 176; Beard v. Akerman, 5 Esp. 119; Jones v. Brook, 4 Taunt. 464; Parr v. Eliason, 1 East, 92, are a few of the English Cases. Those from New-York, before referred to, prove the same thing. Loyd v. Keitch, 2 Con. Rep. 192; Churchill, v. Suter, 4 Mass. Rep. 162 This last was a case agreed, and the facts almost exactly like ours. Parsons says, í£If a sale under these circumstances is not to be considered usurious, it is not easy to conceive what sale is within the statute/5
The second ground, on which I think the appellants must succeed, is, that the note (even supposing it perfect and available as between maker and endorser) was passed by Wilson & Orr, through the broker, to Johnson, at an usurious discount: that by this usury, the endorsement of Wilson 4' Orr, the payees, was rendered void; and no one holding could claim under it. The statute declares ail usurious contracts “ utterly void/5 Now, that contract which is utterly void, can produce- no effect, can operate nothing, and is, in truth, as if it had never been. If the endorsement of Wilson 4- Orr transferred their interest in the note to the buyer, could it possibly be said to be “ utterly void ?55 What more could it do than pass the title, if it had been valid ? Is it not a contradiction in terms, to say that a void endorsement passes the title ? In the ease of Barnard v. Young, 17 Ves. 44, Keighly executed a deed assigning 8,500/. of East India stock to Young. Keighly afterwards became a bankrupt, and his assignees filed their bill, praying that the defendant might produce the deed, and charging that it was illegal and void, as being founded on an usurious contract. Sir William Grant says, £i It was objected that Young’s assignment was void, as being usurious; and if it is usurious, the consequence must follow, that it is wholly void. The party, in whose fayor an usurious contract has been executed, cannot make *356 use of it for any purpose whatever.” The endorsement °f the payees being utterly void, the property of the note remained in them. If the endorsement of the payees had been valid, and any subsequent endorsement void, the hoider might still have sued on the note; for, he might strike out all the intermediate endorsements, and claim under the endorsement of the payees. But, every subsequent holder must claim through the payees; and when their endorsement is void, no holder can maintain a suit. I know that in Daniel v. Cartony, 1 Esp. Rep. 275, and Parr v. Eliason, 1 East’s Rep. 92, Lord Kenyon overruled a defence of this kind; deciding, that usury in any intermediate transaction respecting a note, can never make it void in the hands of a bona fide endorsee, where there was no usury in the original transaction. But, I consider these decisions overruled by a case before Lord Ellenborough in 1816, where he decided, that if the payee has endorsed the note on usurious terms, such endorsement will be void; and that, therefore, a subsequent holder cannot claim through such endorsement. For the reasons I have given, I am clearly of opinion, that this is the better law. The case I refer to is Lows v. Mazaredo, 1 Starkie, 385, more fully reported in Comyn on Usury, 175. M. being indebted to L., the latter drew a bill of exchange on M., payable at two months, to his own order. M. accepted. L. took the bill to a broker, who discounted it at an usurious rate. L. endorsed it in blank. The broker passed it without endorsement to A., who passed it to the plaintiffs. They sued M., the acceptor, and the defence was usury in the contract of the payee. The plaintiffs (at Nisi Prius before Lord Ellenborough) relied on the case of Parr v. Eliason. Lord Ellenborough, after observing that that case had been-, doubted, allowed the plaintiffs to take a verdict, with liberty to the defendants to move to enter a non-suit. Upon-this rule, the case was well argued for the plaintiffs. The Court stopped the counsel on the other side. Lord Ellenborough observed, ” that the bill *357 having been stained by the payee with usury, could never be effective until it. was cleansed. Had it been called in by the payee and re-published, it, might have received an effeet de novo. But tainted as it was, every one must take it subject to its vice, it was impossible to reject one part of an endorsement, and retain another part; but, that it would be necessary, either to receive or repudiate the whole unsound matter.” His Lordship added, that he had turned the case of Parr v. Eliason in his mind, with great doubt, and that, having been of counsel in that case, he remembered that at the time of its decision, there was great conflict of opinion on the subject. The rest of the Judges concurred; Mr. Justice Baíly remarking, that as every endorsement was considered in law as a new drawing, the plaintiffs must necessarily claim under this new drawing, which was usurious.” The rule for a non-suit was made absolute. This is a much stronger case than ours, in this respect, that the bill was given for a full and valuable consideration, and was perfectly available between the payee and acceptor; whereas here, the note was made to raise money at usury, and was mere waste paper, till the usurious discount gave it being. See the case of Chapman v. Blade, 2 Mau. & Selwyn, 589, decided in 1819, where discussing the question whether usury in the endorsement of the payee disabled any subsequent holder from claiming through him, C, J. Abbott, delivering the opinion of the Court, says, “ The case of Lows v. Mazared.o being subsequent to Parr v. Eliason and Daniel v. Car tony, must, in our opinion, be taken as furnishing the rule of law upon the subject; more especially, as the law has since been altered by a statute,* passed probably in consequence of the decision of that very case.”
*358 The case of Hansborough v. Baylor is objected; but the differences between that and this case, both as to the circumstances and the subject of the contract are so strik'ng) that the one can never be considered as governing the other. These differences I will not now stop to point out.
Upon the whole, I am clear that the facts found, prove the note usurious in its inception, and void: that if not void in its inception, the endorsement of the payees was usurious and void; and that on both grounds, the judgment of the Court below must be reversed, and a judgment entered for the appellants.
Judge Green.
This is an action of debt by R. C. Adams endorsee of Wilson fy Orr against Whitworth &? Yancey, in which the jury found a special verdict, that the negotiable note on which the suit was brought, was drawn by the defendants without consideration, payable to Wilson 4r Orr, who endorsed it in blank, and delivered it to Belches a broker, and requested him to get the money for it; without stating what was the consideration, and why it was made; Wilson, the acting partner of Wilson Orr, having the evening before asked the broker whether he could raise money for him, to which the broker replied, “yes, on good paper;” and Wilson afterwards having, on the same evening, sent a message to the broker, which he did not receive, to know whether the names of Whitworth # Yancey would do. That the said Belches, as broker, took the note, and sold it to Wm. R. Johnson, at a discount of 3 per cent, per month, without communicating any thing to Johnson about the same, as to the intention of the parties, or the names of the proprietors of the note; and said nothing upon the subject, except that he offered the note for sale, and without further conversation the note was purchased as aforesaid; and that the money paid for the note, was Johnson’s and no-t the broker’s money.
*359 Upon this verdict, the Superior Court gave judgment for the plaintiff.
The defence was, that the note and the transfer of it by Wilson 4' Orr were both void for usury; and the questions which arise are, whether the note itself was, in the words of the statute, “made for the payment of money lent, on which a higher rate of interest was reserved than is allowed by the statute,” or in other words, was it usurious in its inception, or to use the phrase of Lord Ke\wox, in its concoction ? And whether, if not void for usury in its inception, the contract by which it was transferred to Johnson, was usurious and void; and if so, whether the drawee of the note (the defendants) can avail themselves of the fact, that the transfer was void, as against the plaintiff, a subsequent bona fide holder of the note ?
Before proceeding to examine the effect of the facts found in this particular case, it will be useful to advert to some of the general principles settled in relation to questions of usury.
The statutes of usury are said by several of the English Judges to be penal statutes, and consequently, to be con - strued strictly. This declaration is remarkable, inasmuch as the statute, 13 Eliz. ch. 8, sec. 7, directs, that the statute 37 Hen. 8, ch. 9, enacted against usury, should be? construed largely and strongly against the party offending by way of device dirently or indirectly. However this may he in England, our statute having no such provision as that of Elizabeth, is certainly penal; and the general rule is, that penal statutes are to be construed strictly. This rule is, however, liable to exceptions in eases oí statutes intended to prevent a general mischief, or to pro mote the public good; as the statute of frauds, which is highly penal in England, TwynCs Case, Co. Rep.; and when it applies, it means nothing more than that a penal statute shall not be extended by equity, to persons or things, not expressly provided for by its terms'. It ought, however, even when construed strictly, to ho carried irde *360 effect according to its true intent and meaning, 9 Vin. Abr. 521, pl. 97. This is a rule for the construction of the terms only of the statute, and, it seems to me, can have no sort of influence upon the enquiry as to the truth of the. fact alleged as coming within these terms. In enquiring into the fact, whether a transaction was a loan or a sale, the weight and effect of the evidence cannot be impaired or increased by the consideration that the statute is to be construed strictly or liberally. No construction of the statute can have even the least tendency to prove or disprove the fact alleged.
The statute of Hen. 8, which governs, and has in some measure given a construction to all the subsequent statutes of England upon the subject of usury, expressly requires, in order to constitute usury, that there should be a corrupt intent; and this must, therefore, be alleged in pleading the statutes. Our statute, on the contrary, whilst it in terms requires a corrupt intent, in order to subject the parties to the penalty prescribed by the act, declares all bonds, &c. void, if made for the payment of money lent, on which a higher interest is reserved than the law allows, without requiring a corrupt intent on the part of the lender. This distinction between the English statutes and oiirs has no practical effect upon any question of usury. In England, the allegation of a corrupt intention is mere form of pleading. It is an inference of law from the fact of the intentional taking or securing more than legal interest; and is inferred by the Court, either from the facts found by a jury, or agreed by the parties, or alleged in pleading and admitted by demurrer. Roberts v. Tremayne, Cro. James, 507; Gibson v. Fristoe, 1 Call, 62; Marsh v. Martindale, 3 Bos. & Pull. 153; Reynolds v. Clayton, Mod. 397—2, and 15 pl. S, S. C. and so conclusive is this inference of law, that if the jury find facts shewing that the party intentionally took or received more than legal interest, the Court will infer the fact of corrupt, intention, against the expressed opinion of the jury, that *361 "i: the party did not think he was acting contrary to law;” as was the finding in Marsh v. Martindale.
It was said in Price v. Campbell, 2 Call, 110, that in order to constitute usury, there must be a corrupt intent on the part of both the contracting parties. In that case, Braxton purchased bonds of Campbell, and in payment drew bills of exchange on several persons in Great Britain, with whom he had no correspondence, and which he knew would not be paid; and that consequently, he would be liable to pay in damages and costs, largely more than legal interest. His object was obviously to raise funds by this expedient. It did not satisfactorily appear, though there was strong reason to suspect, that Campbell was privy to Braxton’s views. The Court held, that inasmuch as there was no agreement between the parties that the bill should not he paid in Great Britain, but should be paid in Virginia, with damages after protest, that Braxton might have provided funds in Great Britain, to take up the bill, and so have avoided the liability to pay the damages, it was not an usurious transaction, as it would have been, if there had been such an agreement. Nothing could deprive him of this right to avoid the payment of a sum exceeding legal Interest, hut such an agreement, which could not exist without his concurrence. The Court were, therefore, right in declaring, in that case, that to constitute usury, both parties must have concurred in such corrupt agreement; and the rule is applicable to most cases; for, there are few cases in which a party can be bound by any contract without his express assent. But, cases may occur, in which a party, who has no intention to make a contract to pay more than legal interest, may be bound by such a contract, unless he can avoid it by the plea of usury; and the true rule is, that any transaction in which the lender reserves intentionally more than legal interest, is void, for that cause only, even if the borrower docs not concur in that intent; and this proposition was sufficient for the decision of Price y. Campbell, The statute, in terms, prohibits the taking, *362 not the giving, or giving and taking, or contracting to give and take, more than legal interest; and avoids assurances made for the payment of money lent, on which illegal interest is reserved or taken, not contracted to be received or given. The literal terms of the statute apply exclusively to the lender, and do not require the concurrence of the borrower in the illegal intent. If the security for money lent, is, by mistake of the scrivener, made to secure a greater interest than is legal, and the lender parts' with his money without a knowledge of the mistake, there being no corrupt or illegal intention on his part, the security is valid, and cannot be impeached at Jaw. Nevison v. Whitley, Cro. Car. 501; Booth v. Cook, Freeman, 264; Rush v. Buckingham, 2 Vent. 83; Glassford v. Laming, 1 Campb. 149. But, if the lender discovered the mistake, before he parted with his money, and with this knowledge, had proceeded and advanced his money, with intent to avail himself of the mistake, this fraudulent and corrupt intent would be usury, and avoid the security. This is the opinion of Mr. Ord, in his Treatise of Usury, and is, I think, well founded; although there is no express adjudication on the point. In such a case, the borrower would be no party to a corrupt agreement.
In the case of Powell v. Waters, 17 Johns. 176, the defendant executed his note, endorsed by another for his accommodation, with intent to procure it to be discounted at bank at a legal rate of discount, and delivered it to an agent for that purpose. The bank refusing to discount it, the agent, without the knowledge or consent of the drawer or payee, endorsed it himself, and procured it to be discounted at more than legal interest, by one who knew the facts; and in a suit against the drawer, the note was held to be void for usury.
In Ackland v. Pearce, 2 Campb. 599, a bill drawn and accepted for the accommodation of the acceptor, without any knowledge on the part of the drawer, that it was agreed, or intended to be discounted on usurious terms, was held, *363 n a suit by the person discounting it against the drawer, to be void for usury; and in Young v. Wright, 1 Campb. 139, there was the same decision in a similar case. In all these cases, the defendant was not a party to the illegal agreement, unless the person to whom the bill was entrusted, being his agent, the contract was to be considered as a contract made by the party through his agent; in which case, both parties concurred in the illegal intention; which is, I think, the legal effect of such a transaction, as will be hereafter more particularly noticed.
In respect to the intent which constitutes usury, I think it is the intentionally taking or receiving, under any circumstances, more than legal interest, on the part of the lender or creditor, with or without the concurrence of the borrower; and that this intent is an inference of law, which may be made by the Court from the facts submitted to it by the verdict, agreement of the parties, or demurrer to the pleadings.
The only remaining ingredient necessary to constitute usury, is that the illegal interest shall be taken or reserved upon a loan, or for forbearance. Amongst the infinite variety of shifts to evade the statute, nothing has been more common than to give to a loan the appearance of a contract of hazard or of a sale, neither of which fall within the statute. Whether the transaction is a loan or a contract of hazard or a sale, depends entirely upon the real intent of the parlies to the contract. This is also in many cases an inference of law, to be made by the Court from the facts ascertained by the pleadings, or by a special verdict, but may, in all cases, be delermined by the jury, and in some eases, can only be determined by them, as in the ease of Hamilt v. Yea, 1 Bos. & Pull. 144. A banker having discounted largely for the defendant, paid him the money by bills on London, and upon the transaction, made a profit beyond legal interest. But, whether this profit was allowed to him as extra interest, or as a compensation for the hazard and trouble of remittance, could not be inferred from *364 the mere fact of the allowance being made; and the jury only could determine to which of these considerations to refer the allowance. But, that there are cases, in which the inference that a contract in the form of a contract of hazard or sale, was really a contract of loan or forbearance, may be made by the Court from the facts alleged in the pleadings, or found by the jury, is proved by a series of unquestioned authorities, which were cited in Stribbling v. The Bank, ante. 132.
The first enquiry, upon the finding of the jury in this case, is, whether the note was, in the words of the statute, “an assurance made for the payment of money lent, on which a higher interest is reserved than is allowed by law;’5 and to ascertain this, we are to consider, not the form or colour, but the real substance of the transaction. The note was not made as an assurance for the payment of money to any one, until it was discounted by Johnson. Neither Wilson <$’ Orr nor Belches could have claimed any thing on this note against the drawers. It was not made with that intent; but, with intent that it should be a security to any other person, who might discount it, not as a security only for the money advanced by him, but for the nominal amount of the note. If a note made for valuable consideration may be sold at any discount, (a question which will be hereafter examined) it is because it is an assurance for the payment of a subsisting debt. The debt is the subject of sale and purchase. Here, however, there being no subsisting debt, and no assurance for the payment of a debt, which Johnson could purchase when he advanced his money, it was not a purchase, but a loan, upon the security of the parties to the note; and then, for the first time, the note was made for the security of the money lent, to be paid at the end of 60 days, with interest at 36 per cent.per annum; that being the rate at which the note was discounted. Johnson intended to lend his money at this usurious interest, and not to buy a note. A man wanting money at a distance, has a motive to buy a bill of *365 exchange payable there. But, when he advances his money upon a note payable at a place where he resides, and where the parties to the note reside, and takes the engagement of the party to whom he advances the money, to re-pay it with legal or usurious interest, his only possible intent is to lend his money for the sake of the interest, and to hold the party borrowing bound for the re-payment. This is, in truth, to purchase the note of the man to whom the money is advanced; and is, in its nature, a loan, no matter by what name it may be called. This conclusion could not be doubted, if Johnson had had full notice of the facts, that the note was made without consideration, for the purpose of raising money for the accommodation of Wilson Orr, and that Belches was acting as their agent in disposing of it. It was held in Taylor v. Bruce, by two Judges against one, that under such circumstances, the purchaser of the note, at a discount greater than legal interest, was not guilty of usury, if he was not privy to the facts in relation to the making of the note, and the agency of the broker. This opinion proceeded upon the idea, that as to the purchaser without notice, the note, no matter under what circumstances it was made or discounted, was a bill of exchange, and that the law merchant attaching upon it, the bill imported a consideration not to be questioned in the hands of such a purchaser; and that an endorsement in blank was equivalent to an order to pay to the bearer; and the purchaser might therefore deal with the agent of the party to the note, not as agent, but as owner. These rules are unquestionably true in general; and if applicable to such % case as this, would preclude any enquiry as to the fact of usury in the making or negotiating of the note. It would have that effect, by suppressing the evidence as to the consideration, and of the agency of the broker in disposing of it. The cases of securities avoided by statute, for usury and gaming, are exceptions, and, I believe, the only exceptions to those rules. When a bill of exchange is impeached on the ground of usury in its inception or *366 negotiation, the transabtion must be tested by the principies of the common law, and not by those of the law merchant; and if, upon common law principles, the security is void for usury, then it has no existence as a negotiable security, and the law merchant cannot attach to it. If it could, the effect would be to shut out all enquiry as to the consideration, and as to the agency of the person with whom the purchaser dealt for one of the parties to the note. By the law merchant, a bona fide holder of a bill endorsed in blank, may acquire a valid title from a person having himself no title, and even from one who stole the bill. But upon common law principles, no man can transfer more right than he has; and whoever deals with an agent having no title, even without notice of his agency, and with a belief that he is dealing with him as principal, in effect deals with the real principal, and acquires the title or not, according as the agent has disposed of the property, according to his authority or not. As in the case of a factor, who having authority to sell only, cannot make a valid pledge of the property of the principal, even to a person dealing with him under the belief that he is the owner; and in the case of a sale by a factor, who acts in his own name as principal, and when the purchaser has no reason to suspect that he is acting as an agent, the principal can maintain an action against the purchaser. So in this case, the law merchant not having any effect in the enquiry whether the transaction was or was not usurious, Johnson dealt with Wilson fy Orr by their agent Belches, although he might not know that he was dealing with an agent, and so purchased the note endorsed by them from them, at a discount of 3 per cent, per month. When Johnson so purchased from Wilson Orr, upon common law principles, he acquired no pre-existing right of action against Whit-worth fy Yancey, as Wilson fy Orr had none; and the effect of the whole transaction was, that he advanced to Wilson Orr a sum of money, and took their engagement with that of Whitworth fy Yancey, to re-pay the *367 money at the place where it was lent, with more than legal Interest; and thus, whether he knew or did not know, that the note was without consideration, or that Belches was an agent, or believed that he was acting for himself, his whole object was to advance his money on this security, and upon these terms; and this is the act of reserving illegal interest intentionally, which constitutes usury. If he had discounted the note at a legal rate, then as there could have been no imputation of usury, the note would have had the effect of a bill of exchange, the law* merchant would have attached, to if,_ and the consideration and fact of Belches* agency cmpl^Rt have been enquired into.
Thesejffinciples are fully established by judicial decisions in England, añd in some of oujj^gister States.
Thus, where the transaction is impeached, on the ground of usury, and the sale has been made by an agent or broker, for one of the parties to the bill, and the agent or broker endorses the bill without an agreement to that effect, and thus emphatically represents himself as owner; or if he does not endorse it; in either ease, the purchaser is held to have purchased from the principal, whether he knew or did not know, that the person with whom he dealt acted as agent. This has operated sometimes to save the transaction from the imputation of usury, when the purchaser gave a full consideration for the bill, which would be void if the agent was considered as dealing as principal; and always to condemn the transaction as usurious, where the dealing with the agent was such, as would have made if usurious, if it had been with the principal.
The cases of Dogwell v. Wylie, 2 Campb. 33; Jones v. Davidson, 1 Holt, 256, and Young v. Wright, 1 Campb. 139, seem to me to have proceeded on these principles altogether. In the first of these eases, the action was by the endorsee against the acceptors of a bill. A broker swore that he had repeatedly discounted bills for the defendants, with his own money, at half per cent, more than legal interest; the Iasi of which becoming due, and the defendants' *368 not being able to take it up, and the broker no longer having money himself, he offered to get two other bills discounted, (one of which was the bill sued on) for the same commission he received before; and accordingly, the defendants accepted two bills for this purpose, which the broker got discounted at legal interest, but paid no part of the money to the defendants. And he swore that the commission which he was to have for getting the last bills discounted, was intended as commission for his trouble as a broker, (which was largely more than the legal commission,) and not as interest for the loan of money. Lord ElIíÉnborough held, as did the Court, id^pKu'ule to set aside the verdict, that this was not usury, Because the bill was not discounted bv Simmer (the Broker) with his own money, and he acTea in the transaction as a broker, and since the parly who advanced the money received no more than legal interest.
The case of Jones v. Davidson was this. The bill was drawn by Richards on Davidson, accepted by him, and endorsed by Richards. Davidson applied to Duckworth to raise him some money upon his bill. The bill in question was accordingly drawn, which Duckworth promised to get discounted for 30 shillings, which was greatly more than the legal allowance for brokerage. The bill was delivered to Duckworth with this understanding, that he should get it discounted, giving the value of the bill (minus the 30 shillings which he was to take out of it) to the defendant. Duckworth’s name was not on the bill at this time, but he carried it to Shore, who discounted it at legal interest, but required Duckworth to endorse it, which he did. Gibbs, C. J. held, that if Duckworth was by the original agreement to have been a party to the bill, and to discount it either with his own or another person’s money, receiving thereout 30 shillings as so much of rebate from the principal sum, it would be an usurious contract; but if it were a mere agreement between the parties, that the bill should go out in its full security to the *369 world, and that Duckworth (who does not appear to have been an original party) should receive 30 shillings as a compensation for getting it discounted, it would not then be usury; although Duckworth, when he procured the money from Shore, endorsed it over to him, and became a party by tho endorsement.
The case of Young v. Wright was this; Assumpsit by Young against Thomas Wright, on a bill drawn by him on Charles Wright, and endorsed by the defendant, by B. Tenant, and by P Young. King testified, that he had long been in tho habit of discounting bills for Charles Wright the acceptor, at first at the rate of 5 per cent, per annum, afterwards at 40 per cent, per annum: that he had agreed to get the bill in question discounted for Mm, on these terms; and accordingly got it discounted by a Mr. Reeves, who gave for it some checks which were never paid, and goods, which, when sold, produced only 50/., this being the whole sum which C. Wright had received upon it. The counsel contended, that the bill was good in the hands of a bona fide holder for valuable consideration, because the supposed usury had been committed be-' tween King and Reeves, third persons no parties to the bill. There was no usury, therefore, in its original formation, but only in negotiating it; by which the present plaintiff could not be at all affected. Lord E:leenborotjgh however held, that if the witness was believed, there must be a verdict for the defendant. “According to the evi ■’lenco given at the time the bill was drawn, there was a corrupt agreement, that it should be discounted at usurious interest, by which it was vitiated, into whatever hand it should afterwards come.” This opinion of Lord Ellenborough was pointed to the argument of counsel. At that time, according to Lord Kenton’s doctrine in Parr v. Eliason, a bill good in Its inception was considered as available to a bona fide holder, notwithstanding any usury in Its negotiation by the payee; and there seems !o have been an unsettled notion, that a bill was not void *370 in its inception, unless it was made for the purpose of being discounted at usurious interest; as is intimated by Le Beanc in Jlcklancl v. Pearce. The first point has been overruled in Loioe v. Mazaredo, in which it was held, that although the bill is not vitiated by usury in its first negotiation, yet that the holder can derive no title to it by such a transfer; and the second point never had any foundation in any judicial decision, and is directly repudiated by the leading case of Lowe v. Waller. Lord Ellenborough’s observation, that there was a corrupt agreement, when the bill was drawn, that it should be discounted at usurious interest, was a direct answer to the argument of the counsel, taking into consideration that it was actually discounted at usurious interest. Without that, it would have been no. answer. If Reeves had discounted the bill at legal interest, Lord Ellenborough, who shortly after decided the case of Dogwell v. Wylie, would have held, as in the latter case, so in this, that King, not having discounted or agreed to discount the bill with his own money, and not being by contract a party to the bill by discounting it himself, and for his own benefit, the party discounting it having received no more than legal interest, there was no usury in the case;' whether King retained to himself, for his services in getting the bill discounted, the 40 per cent., or as in the case of Jones v. Davidson, the whole money. These transactions between the principal and agent, could not affect a party dealing fairly with the principal through the agent. It is impossible that Lord Ellenborough should have perceived any real difference between the expression in the case of Young v. Wright, “ agreed to get the bill discounted for him at 40 per cent, per annum discount,” and that in Dogwell v. Wylie, “he offet'ed to get two other bills discounted upon the same commission he had before” (which was clearly usurious when the party discounted the bill himself;) and the expression used in Jones v. Davidson, “with this understanding, that he should get it discounted, giving the value of the bill,’s *371 ■Minus the SO shillings he was to take out of it. All these expressions plainly import an agreement, not that the farokers should purchase the bills, and pay agreed sums at all events, as parties, but that they should get the bills discounted for the parties, as their agents. If in the cases of Dogwell v. Wylie and Jones v. Davidson, the bills had been discounted at more than legal interest, (the opinion of Lord EAtyenboiiottgii laying stress upon the fact, that the discount had been at legal interest,) I cannot, doubt that the transactions would have been held to be usurious; although in the last, the broker, without any previous agreement to that effect, with the parties to the bill, acted so decisively as a principal, and not as an agent, as to endorse the bill himself. I think all these cases clearly go upon the principle, that in enquiring whether a transaction in the form of a bill of exchange is usurious or not, the law merchant has not the slightest effect, that not attaching upon the transaction until it is ascertained, by the principles of the common law, whether it be a bill of exchange or not; that according to the common law, a party dealing with an agent deals with the principal, whether he knows it or not; and that, whether the rule benefits or injures him.
I observe too, that in Young v. Wright, the purchaser Is not suggested to have had any knowledge, either of the original purpose for which the bill was drawn, or that King was acting as the agent of Wright. Why could he not, therefore, deal with King as owner, in which case, if the bill had been given for consideration, and assigned to King for value, King not endorsing it, the purchase might have been made on any terms, without usury ? As I have before said, if the purchaser had given full value, the bill would have been good, notwithstanding the original purpose of the parties in making it; and giving less than its value allowing a discount of legal interest, the contract was usurious on that account, and not on account of the purpose for which the bill was drawn.
*372 It is not necessary, in order to avoid a bill of exchange on the ground of usury, if the first real negotiation of it be not at a discount greater than legal interest, that there should be an agreement either between the parties to the bill, or between them or either of them and another, that the bill shall be discounted on usurious terms; although there is a dictum to that effect by Le Blanc, J. in Ackland v. Pearce, 2 Campb. 599. In the leading case of Lowe v. Waller, Doug. 736, no such previous agreement or intent appeared. All that appeared was, that the bill was accepted for the accommodation of the drawer, who transferred it on usurious terms,- and in dlc/clandv. Pearce, the drawer, the defendant, did not know that the object of the acceptor was to discount the bill at usurious interest. And in Powell v. Waters, it was held that a negotiable note was void for usury, which had been made and endorsed for the purpose of being discounted at the bank at legal interest, and which was discounted at more than legal interest, at the instance of the agent of the drawer, for whose accommodation it was drawn and endorsed, and that, without the knowledge of the drawer or endorser'. Nor is it necessary,-in order to avoid a note for usury, in consequence of its being discounted at more than legal interest in its first negotiation, that the purchaser should know that it was without consideration, or made for the purpose of being discounted at more than legal interest. The purchaser does not appear to have had any knowledge of such facts in the case of Young v. Wright, 1 Campb. 139. This precise question was presented in the most imposing form, it being the only point in the cause, and presented as a naked question by a bill of exceptions, in the case of Bennett v. Smith and Philips, 15 Johns. Rep. 355, in which it was held, that an accommodation note, intended by the parties to be discounted by the person who afterwards discounted it, at a discount greater than legal interest, was void in the hands of a subsequent bona fide holder, although the person first discounting it did not know, that *373 It was an accommodation note, or intended to be discounted, and made for that purpose; and the same doctrine was affirmed, though not directly applicable to the case in Powell v. Waters, 17 Johns. 176.
Upon principle and authority, therefore, I conclude that this note being, in its first negotiation, which alone made it a security for money, discounted at an interest of 3 per cent, per month, was void in its inception for usury, and cannot be the foundation of an action, even in the hands of a bona fule subsequent holder
If, however, the note could be considered as valid in its inception, as between the drawer and payee, then any person claiming as endorsee against the drawer must show, that a valid transfer has been made by the payee, without which he cannot possibly have a legal title to the debt due by the note; and if the plaintifi has not a legal title, it will be a good defence to shevv that fact. If the transfer be void to all intents and purposes for usury, the title no more passes by it, than it would by the endorsement of a married woman, to whom a bill was given, or by a bankrupt after his bankruptcy, or by a person to whom the bill was not given, although of the same name. Conner v. Martin, 1 Str. 516; Philisbock and Wife v. Pluckwell, 2 Mau. & Selw. 393; Batteson v. Goodwin, 12 Mod. 50; Meade v. Young, 4 Term Rep. 28. The case of an infant endorsee is not an exception to this rule; his contract not being void, but voidable at his election only. So indispensable is it to prove a valid transfer by the payee, that it was required to prove his endorsement in the case of a bill accepted after it was endorsed. Smith v. Chester, 1 Term Rep. 655. And in enquiring whether the transfer of a bill is void for usury, it is to be determined by the rules of the common law, and not of the law merchant, for the reasons before stated.
The necessity of proving, on the part of the plaintiff, in a suit against the drawer or acceptor, a valid endorsement by the payee, so as to transfer to him the legal title, has *374 never been questioned, except by Lord Kenyon in Daniel v. Cartony, 1 Esp. N. P. Cas. 274, and by the judgment pronounced by Lord Kenyon for the Court in Parr v. Eliason, 1 East, 92; in both these cases, the holder of a bill accepted for value, transferred it at an usurious discount. In the first case, the bill came to the hands of a bona fide holder, who sued the acceptor; in the second case, the bill passed into the hands of the assignees of the purchaser, and the endorser brought an action of trover for the bill against them. And in both cases, Lord Kenyon argued that the bill, being good in its inception, could not become void by any subsequent usurious transaction in the negotiating it; and that a bona fide holder could not be affected by such subsequent usury. It was unquestionably true, that the bill itself was not vitiated by the usury in the transfer of it; and the acceptor was still liable to pay it. That was not the question in either case. The true questions were, whether the plaintiff was entitled to recover as endorsee in the first case, or the defendant to retain the bill in the second case; both of which turned upon the enquiry, not whether the bill was valid, but who was entitled to it; in short, whether the legal title passed by avoid contract of assignment. This question was otherwise decided in the case of Lowes v. Mazaredo, reported in Starkie, 385, and better reported in Comyn on Usury, 175. Ia that case, the bill was accepted for full value. The payee transferred it at a discount exceeding legal interest and the usual commission for brokerage; and it passed through several hands, one of whom gave full value for the bill. The holder sued the acceptor; and it was held, that the first endorsement being void for usury, no subsequent holder could maintain an action upon it against the acceptor.
If, then, the transfer of the note in this case by Wilson 8? Orr was usurious, the action cannot be maintained by the plaintiff, although a bona fide holder, even if the note were valid, as if given for full and valuable consideration. The cases of Daniel v. Cartony and Parr v. Eliason *375 admit, and that of Lowes v. Mazaredo, adjudged, that to discount a valid note at more than the legal interest, and the ordinary exchange and commission, when that is allowable, was usurious; and the English boohs abound with cases to the same effect. If one gives his own bill, in consideration of a sum of money advanced for a greater amount than the sum advanced and legal interest, this is clearly an usurious contract. Every endorser of negotiable paper is the drawer of a new bill, and liable to the payment of the whole amount of the bill or. note, immediately upon the non-payment, protest and notice. This is the legal effect of his endorsement; and he would be bound to the performance of this contract, whenever he has endorsed for value, however inadequate, with an agreement and intent to transfer the note or bill absolutely, for the sole use of the endorsee; unless he was discharged upon the plea of usury. There are many cases when, as between the endorser and his immediate endorsee, the consideration of the endorsement may be enquired into; as, if there were no consideration, and the assignment only for the accommodation of the endorser; or, where there was a fraud in the assignment which went to the whole consideration; or, where the consideration has failed in whole or in part, and the compensation lies in estimate, not in damages; or, where the bill or note, although assigned in full to the assignee in form, was notin fact transferred to him wholly for his own benefit. As if it were agreed that he should hold it as a security for money due or advanced to an amount loss than the hill or note; in which ease, upon the non-payment of the bill, the holder could only resort to the endorser for the amaitnt intended to be secured to him; or, if ho proceeded against the drawer or acceptor of the note or bill, he would recover the whole amount, and be trustee for the endorser for all beyond what was sufficient to pay his claim; but this, only iti cases whore it was clear ihat the endorser was entitled to claim indemnity oi satisfaction from the defend ant.
*376 But, all these cases are wholly different from an absolute transfer for an inadequate consideration, for the use of the assignee. In that case, the contract of the endorser is to Pay ^ whole amount of the bill; and he is, in effect, engaging to pay the full amount for the consideration received. If he was only bound to re-pay the actual consideration received, there could be no case in which the transfer of a bill for money advanced to a less amount than the nominal amount of the bill, after discounting the legal interest, and ordinary exchange and commission (where that is allowable) could be usurious on that account only. Yet, such transactions have been held to be usurious in innumerable instances. A careless note of a Nisi Prius decision of Lord Kenyon has given occasion to the opinion, that an endorser was bound for no more than he received; and that proposition was once adopted as law in New-York. The Courts of that State have, however, virtually renounced that proposition, in the decision of the cases before referred to; in which they held, that to discount a note at more than the rate of legal interest, was usury, even where the purchaser knew it to be an accommodation note. If they had adhered to the construction given to the case of Whiffin v. Roberts, 1 Esp. N. P. Cas. 261, they must have held, that the discount was a valid transaction, and the holder of the note only entitled to claim against the drawer the amount which he paid for the note.
The case of Whiffin v. Roberts was this: Roberts drew a bill in favor of Ould for 86/., payable in three months. The bill was for the accommodation of the drawer; and the plaintiff, who gave 29/. for it, knew that fact. Lord Kenyon said, that “ when a bill of exchange is given for money really due, or is drawn in the regular course of business, the endorsee, although he has not given the endorser the full amount of the bill, yet may recover the whole, and be holder of the overplus above the sum he really paid to the use of the endorser. But, when the bill is an accommodation one, and that known to the endorsee, and he *377 pays but part of the amount, he can only recover the amount actually paid for the bill.” The suit in this case was against the drawer. I am satisfied, that in this case Lord Kenyon proceeded upon the fact probably proved in the cause, that the bill was not sold out and out to the plaintiff; but was only pledged as a security for the money advanced. The enormous disparity between the sums, (29/. given for 86/. at 3 months,) leads to this conclusion; and his allusion to the eases, in which the holder may be trustee for the endorser for a part of the bill, fortifies this conjecture. The case of a deposit or transfer of a bill for the security of money advanced upon its credit, and not for its absolute purchase, is the only case in which the holder can be trustee for the endorser for a part of the bill, unless he has re-paid to the holder, on account of the bill, a part of its amount. If this bill was, by the contract between the endorser and endorsee, transferred absolutely for his own use to the latter, who knew it to be given for the purpose of raising money for the drawer, it would have been a palpable case of usury, according to all the decisions in England and the United States; and the holder could have recovered nothing.
There is a marked distinction between the effect of an assignment of a bond and of a negotiable note or bill of exchange. In the case of a bond, it is at law a valid security for its amount, even as between the parties, although there is no consideration for it. It is, therefore, a subsisting security before it is transferred. A negotiable note or bill of exchange, on the contrary, is not a valid or subsisting security as between the parties, if it be not made upon consideration; and acquires validity only from its first negotiation. The assignor of a bond is in no event liable to re-pay any thing more than the consideration which he received; and that not by force of the contract of assignment, but upon the general principle, that the consideration of the contract having failed, he is bound to restore what he nas received. These differences shew the grounds upon *378 which the assignment of a bond for a consideration less than its nominal amount, deducting legal interest, is held not to be usurious, whether the bond be given for value or not; whilst a negotiable note or bill of exchange, if not given for value, and first discounted at more than legal interest, or a transfer of such a note or bill given for value, upon such terms, is usurious. A negotiable security may be purchased at any discount. If the endorsement by the payee be valid, (as it must be, if not made on an usurious or gaming consideration,) any holder may transfer it without assignment at any discount; and not being, in any event, liable to pay the amount of the bill, it is a sale of. the debt, and if not shewn to be a shift to evade the statute of usury, would be unexceptionable. But, if he endorses the bill, and thereby binds himself to pay the whole amount of it at maturity, and that for a consideration in money received by him, not equal to the amount of the bill, deducting the legal interest for the time it has to run, the transaction is a loan prima facie. For, unless other circumstances appear, disclosing some other motive for advancing money for the bill, it is. necessarily to be imputed to an intention to advance the money to the endorser, upon his own engagement and the engagement of others to repay it, with the profit at a future day; and only with a view to the receipt of the principal and profit beyond legal interest. This is, in its essence, nothing but a loan at more than legal interest.
But there may be cases, in which a discount greater than legal interest may be considered as a sale, although the seller endorses; as if the seller wants money at one place for a - bill payable at another. A discount at a rate greater than legal interest, by the difference in exchange, would be a sale prima facie, and could not be impeached on the ground of usury, unless the discount was greater than could be fairly attributed to that circumstance; in which case, it would be considered as a shift for evading the statute; and private bankers are, in England, allowed *379 no retain, beyond the legal discount, a commission accordIng to the usage of trade, as a compensation for the trouble and expense of remittances, and other expenses and trimble attending such transactions. But, if more is retained for commissions than is reasonable according to the custom of trade, this too degenerates into a shift to evade the statute. Hamitt v. Yea, 1 Bos. & Pull. 144; Castairs v. Stein, 4 Mau. & Selw. 194.
No circumstance appears in this case, to give the transaction the appearance of a sale. The parties who procured the money from Johnson, received- the money, and were to re-pay it at the same place. There was, therefore, no exchange; nor was there any expense of remittance, or any other expense or trouble, possibly to be encountered by Johnson in the collection of the money, other than that which is incident to every other loan of money, and which the law considers as compensated by the gain of 6 per cent, interest. There was nothing to justify a discount at a sent wore than legal interest; much less, a discount at the rate of 36 per cent, per annum. I need not repeat what I have already said, to prove that the contract, by which the note was transferred to Johnson, was a contract between him and Wilson fy Orr, and has the same legal effect as if it had been made between them in person, without the intervention of a broker. And if so, even if the note was originally made for full value, the transfer would be void, and the plaintiff could have no title.
The doctrine which I assert, would induce those who were about to discount a promissory note or bill of exchange, to enquire whether the party offering it to him is owner or agent, and in general he would be informed truly. But, if not, the party falsely affirming himself to be the owner, would be responsible for the injury done by his falsehood. The doctrine of Taylor v. Bruce, on the contrary, affords a strong inducement to the parties to such a transaction, to shut their eyes upon the truth, no matter how strongly the circumstances are calculated to excito *380 suspicion. Thus, in this case, a professional broker offers a note for discount, at the rate of 36 per cent, per annum/ and the note is discounted at that rate, without any questions asked, or information given. This transaction, on its face, shows almost to a certainty, that this broker, and this dealer in notes had come to an understanding, that whenever the broker offered a note made for raising money upon usurious terms, he should give no information, and the dealer should ask no questions; and this, with the sole view of sheltering the dealer, under the rule laid down in Taylor v. Bruce. Nor would the principles I assert, prevent any holder of a note given for value, from commanding funds, by disposing of it at a discount greater than legal interest, without the imputation of usury, by transferring it without his endorsement, or by endorsing it specially without any recourse to him.
Judge Coalter.
As several important questions on the subject of usury are supposed to arise in this case, it is to be regretted that we are obliged to decide them, unaided by the bar.
1. One question, which is said to arise, is this: If an accommodation note, payable at bank, is endorsed in blank by the payee, and handed by him to his agent for sale, and it is sold at a greater rate of discount than legal interest, without endorsement by the agent, and it is afterwards passed bona fide and for full value, by the purchaser to the plaintiff, also without endorsement, and without knowledge in the first purchaser, that he from whom he purchased was agent of the payee; is the note usurious and void in the hands of the innocent holder ?
2. Another question is this; whether, if, for want of such knowledge, the note is to be taken as one given in the ordinary course of business, and the seller the real owner, yet as he paid the payee only the money he received as aforesaid, this endorsement by the payee is to be *381 considered an usurious transfer of the note to the purehaser; and if so, whether any right or title passed to the bona fide holder under him, so as to enable him to maintain his suit against the maker ?
3. The other question is, whether the facts found by the jury in this ease, are sufficient to enable the Court to say, that Johnson the purchaser, knew that the note was for the accommodation of the payees, and that Belches was their broker and agent in the sale; or whether the jury must not find those facts positively, one way or the other ?
These notes, standing under the act, as foreign bills of exchange, as it regards their negotiable quality, the two first questions involve the law of usury in relation to such securities.
In regard to questions of usury generally, some doubts have lately been suggested, whether there is not a difference in the effect of our statutes and those of Great Britain? That is to say, whether, under our statutes, the security may not be void, so that the debt may be forfeited civiliter, when, if the unlawful gain had been received, it might not be a corrupt receiving, so as to subject the party criminaliter to the penalties of the statute ? It seems to me, that on the existence or non-existence of this difference, much of the weight of the argument in support of the two first propositions must depend.
In the country which gave us birth, to which we at one time belonged, and from which, therefore, we have taken most of our civil institutions, and the common law of which is now our law, various statutes are found on this subject.
The first was that of 37 Hen. 8, ch. 9, by which it was declared, that no person, by any way of any corrupt bargain, loan, exchange, chevisance, shift or interest, of any wares, or by any other deceitful way, shall take in gain for one year, &c., above 10/. in the hundred; and if any person shall do any thing contrary to this statute, he shall forfeit the treble value, and shall suffer imprisonment, &e.; *382 one moiety of the forfeiture to the King, and the other to the informer.
This was purely a penal statute, creating an offence, and punishing it criminaliter.
By the statute of 13 Eliz. ch. 8, all bonds and assurances for payment of money lent, or covenant to be performed, upon any usury in any thing, against the act of 37 Hen. 8, ch. 9, upon which there shall be taken above the rate of 10/. for the hundred for one year, shall be void. This statute, having forfeited the debt, reduces the penalty of the statute of Hen. S, as I understand, “ to so much as shall be reserved by way of usury above the principal,” to be recovered as by the said statute.
By the 21 Jac. 1, ch. 17, the rate of interest was reduced to 8/. per cent.; and any contract directly or indirectly to take more, to be void, and the party guilty to forfeit treble the value of the money or other thing lent.
The statute of 12 Car. 2, ch. 13, altered the rate to 6 per cent., retaining nearly the same words; and that of 12 Ann. ch. 16, is also nearly in the same words, but changing the rate to 5 per cent.
In the case of Chesterfield and others, ex,ors of Spencer, v. Jansen, 1 Atk. 339, it is laid down, “ that nothing is legally usurious but what is prohibited by the statutes; and that the material ones are those of 37 Hen. 8, ch. 9; 13 Eliz. and 21 Jac. 1; and that that of 12 Ann. ch. 16, varies in nothing from the former acts, but in reducing the rate of interest. For, in the penal clauses, all the words of the statute of Hen. 8, are taken in; so that the cases determined on the first of these statutes, are looked upon as authorities upon all the subsequent statutes.” Thus we see that the statute of Hen. 8, was purely penal, and did not affect the contract. That of Eliz. avoided the contract in all cases of usury against the statute of Hen. 8. So that, thus far, it clearly required the same evidence of an usurious contract, under which unlawful interest was received, to convict under the statute of Hen. 8.
*383 As to subsequent British statutes, allthe authorities agree, that they differ not from these, except in reducing, from time to time, the rate of interest, and perhaps, in intro-during words of greater latitude as to the contracts to be avoided, and so as to extend to all shifts and contrivances to evade the laws. In England, therefore, no such idea has ever existed, as that there should be any difference in construction, or the evidence necessary to support the defence or prosecution, between the clause forfeiting the debt, and thereby, civiliter, (if I may use the expression) inflicting a punishment to that extent, and that imposing the penalty of treble the value for receiving the unlawful interest. In this respect, as I understand, it has always been held there as a penal statute throughout.
These statutes, owing, I presume, partly to their inaptitude to the condition of a new Colony, and partly to their penal sanctions, were not in force here; and we had no laws against usury, until the Colonial Legislature enacted them. 1 Black. Com. 108.
The first was that of 1730, 4 Stat. at Large, 294. It is much like the) statute of 12 Car. 2, ch. 13; and in the Revision of 1733, it is noted in the margin as that statute,
There is another statute in 1734, which, amongst other things, provides for a discovery of usury by bill in equity. &c. Ibid 395.
Thus it appears, that in this, as in many other respects, the Colonial Government pursued the course of legislation of the mother country; and consequently, we have always looked to their decisions on similar laws, as safe, guides in this, as in all like cases.
I understand, until it has been lately questioned as to this country, that in England as well as here, whenever ® party has received what is alleged to be usurious gain, if lie could not be punished under what is called tho penal part of the statute, the contract would not be considered ap void, and vice versa. This I take to have been hitherto considered as settled law, as a general rule; that is, as *384 applicable to the transactions of the original parties to the contract. The case of the debt being forfeited in the hands of an innocent holder of an usurious note, or of such holder receiving the money and not incurring the penalties, cannot be called exceptions to this rule; nor, I presume, is the case of a wife, who, without the knowledge, combination with, or contract of the husband, lends money at usury, and he. receives or sues for it. Nor is the case of an agent taking such security, the principal giving no authority, and knowing nothing of the transaction.
Cases have been cited, where a man’s ignorance of the law, and his belief that he was not acting contrary to it, would not avail him in a civil suit. But, that would no more avail him in defence of a criminal prosecution, than in repelling the defence of usury to a suit on the bond. Ignorance of law is no excuse; he has done the act which is contrary to law; his mind concurred in that, and he must abide the consequences. If it is usury for one purpose, it must be for every purpose of the act.
The argument, by which it is said, that one situated as in the case supposed, only runs the risque every man does, in taking an assignment, dona fide, of a security which turns out to be usurious and void, can only have its origin and support in this novel idea. How is this ? The act done, and that by the party himself, is voluntary, and is the very act of usury complained of. It may, however, be perfectly innocent and legal, and so far as the party knew, was so. It is only unlawful and void, by reason of the acts of others, of which the supposed usurer was ignorant, and as to which he may have been grossly misinformed and deceived. But his security is void. Those who deceived him and knew the facts, but concealed them, have got his money, and he has no recourse on them. If the debt in this case is forfeited under the act, it is a very different case, indeed, from that of him who is the assignee of an usurious security. He has his recourse against his assignor, and cannot be punished for the usury, as the other can, *385 according to my views, if he committed the usury; and surely no one else did, if he did not.
But it is said, that when he purchased, he knew that he was giving less than the face of the note deducting legal interest, and therefore, he must risque the consequences-If it turns out to be a note for value, or in the usual course of business, as he believes it is, the purchase will be lawful and valid; otherwise, if it is for accommodation, he forfeits his money; or if he receives it, even although he knew nothing of this fact, ho is guilty of usury, and forfeits double the amount of the debt. This would operate like an ex post facto law; and a construction resulting in such consequences, it seems to me, cannot be correct.
It is furthermore said, that such accommodation note must be usurious and void, because it had no legal existence as an available security, until it was delivered to the purchaser, on the sale. Thus coming into existence on a discount at more than legal interest, it is unlike a note for value, which is valid and available the moment it is executed; aud it is, therefore, concocted in usury, notwithstanding it is a genuine note, and according to its face and attending circumstances, an available note in the hands of the holder who offered it for sale as his own property. This again, if usury, and punishable as such, must be a hard case; and the question is, whether the law will bear such construction ?
An ordinary note or bond may be purchased at a greater discount than legal interest, without imputations of usury, although such bond or note be given for accommodation, the purchaser being ignorant of that fact. Gibson v. Fristoe, &c. 1 Call, 62; Price, &c. v. Campbell, 2 Call, 110; Brown v. Brent, 1 Hen. & Munf. 4; Skipwith v. Gibson & Jefferson, 4 Hen. & Munf. 490; Hansbrough v. Baylor, 2 Munf. 36. Why shall not this also he usury ? Because, say our decisions on this point, there must be a loan ov forbearance, and that on a contract between parties having a mutual intention to borrow and lend. &r\ *386 But such bond or note, as last above mentioned, was only available when transferred; and unless it be on some supposition, that negotiable notes are more capable of being abused for purposes of usury, I am not able to distinguish between the two classes of cases; whilst, to attach the risque above insisted on, to the purchase of negotiable paper, is to say at once, that none, whether for value or accommodation, shall be sold for less than the face, with legal interest. This, it seems to me, would be mere in the nature of legislation, than a decision according to laws and principles now understood. Indeed, it seems to me, that an accommodation note of the kind in question, is more an available paper or security, before its negotiation, than an ordinary note given for accommodation; and therefore, that the principle insisted on would apply more strongly to the latter. Independently of any question of usury, the consideration of an ordinary note can be shewn at law, which is not the case with a bill of exchange. Even illegality of consideration, unlawful gaming and usury excepted, is no defence to a suit on a bill.
An ordinary note or bond, not delivered, if lost, or stolen, is not the deed or note of the party, and can avail no one. Far otherwise is the law of bills of exchange. So soon as they are endorsed in blank by the payee, and whilst in his or the maker’s hands, for accommodation, they have, to certain purposes, a species of existence; for, if lost or stolen, they are good in the hands of a bona fide holder. In the hands of the maker or payee, they may or may not be available, according as they are or are not for accommodation; and a party purchasing from either of these, at a greater discount than legal interest, will be more or less subject to the charge of usury. But, when it has been passed off by the payee to a third person, for the express purpose of sale, it would seem strange that a ¿sale by such person, because he was entrusted to sell, should not avail, but be usury, when a sale by the thief would pass the title. In the one case too, the payee would *387 receive his money, in the other he would receive no money at all; and yet tho maker and endorsee are both liable to a fair and bona fide holder under tho thief. If the holder and agent loses it, or it. is stolen from him, and it passes into tho hands of a bona fide holder, it is also good, though the payee gets nothing for it. It seems strange to me, therefore, that this should he law, and that yet, when it is voluntarily passed off by that agent, with the full consent of the payee, as the property of the holder, in a way which would be perfectly legal, if it was, what every bill on its face imports, on valuable consideration, if shall he void for usury.
In the ease of a stolen note, it is certainly not an available security to any one engaged in, or cognizant of, the felony; and it only becomes so, whon it is transferred to one ignorant of the felony; but, the felon is certaiuly not the agent of the payee.
To make it. necessary, thenj to enquire whether tho holder i to subject him to all tho disal usurer, in ease he does not, the matter, will essentially chai nature of those securities. In atiahegaug casssjaHEngland, as where it was held that the transfer of amll, after a secret, act of bankruptcy, was void, and gave no title to the holder, the decision was soon found to have this effect, and was remedied by statute; as I believe was also done, when the effect of the decision, which avoided the transfer by the payee of a bill for value, if discounted at a rate greater than legal interest, was discovered. But, this point will be moro fully considered hereafter. This too, would be to reverse the general and sound principle of law and justice, that whenever one of two persons must suffer by the. act of a third, he who has enabled that third person to occasion the loss, must sustain it himself There may be d dozen names on the bill or note; all for tho accommodation of the maker or payee, or even for some one of the *388 endorsees, or for the holder who never endorses; and yet, according to the argument, it is usury with the person accommodated, whoever he may be, although the holder had the absolute legal title, as to all the world, so far as they are ignorant of his agency; and when he parts with the possession, the legal title passes, and enures to any one who, bona fide, gets possession.
If the party purchasing had no reason to believe the note or bill was not the property of the holder, which is the case now under consideration, and the only true one by which to test this question, and he is to forfeit his money, it must be because he is not innocent. If he is, if he stands as the innocent holder or transferee of an usurious security, then he is not the usurer, subject to the penalties of the act; but may get clear of them, under the idea that there is a difference between what is denominated the civil and jjenal clauses of the act. Unless this doctrine, then, can be maintained, there is a case of usury without an usurious lender.
In the case before us, the holder and seller did not endorse. This is considered in law, as evidence of a sale out and out. He is not responsible to the purchaser, and on this ground also, that purchaser does not stand as an ordinary purchaser of a security, void for usury; nor was the transfer, as between these parties, usurious.
It has been held in New York, and is supposed there to be the doctrine in England, that a sale even by the payee, whose endorsement is necessary to make the paper negotiable at a greater discount than legal interest, is not,perse, usurious. I strongly incline to think, that this decision is correct. As between the payee and his immediate endorsee, the liability is no greater than in the caseof an assignment of an ordinary note. It may go no farther; and if the money is not paid by the maker or drawee, the holder can only recover from his immediate endorser, the sum he paid for the note or bill. The payee offers to sell out and out, to the purchaser, at the rate agreed on; but he is told, “ you *389 must endorse, or J cannot pass off the note;” he does so, hut with the express understanding, written or parol, that the purchaser will indemnify him for his endorsement; and though he thus makes himself liable to all the world but the purchaser, for the full amount, it is, as between them, a simple endorsement for the accommodation of the purchaser.
On general principles, then, it seems to me, the law cannot bo as contended for in the first proposition. On authority, also, I feel myself sustained, with the exception of some cases from New York.
The case of Baylor v. IJansbrough, especially if 1 have been successful in shewing that the scienter is as necessary-in cases of bills of exchange, as in ordinary notes and bonds executed for accommodation, is a direct authority in point.
The case of Taylor v. Bruce, which was by a divided Court, consisting of three Judges only, cannot be considered as binding authority here, when the question is again presented for consideration. I have again weighed, with all my feeble powers, the arguments of bench and bar in that ease, as well as the very able arguments of my brethren in this; but without experiencing that conviction of my error, which perhaps they ought to produce.
In the case of Ackland v. Pearce, 2 Campb. 599, the note was made and fabricated after an application for a discount was made, and the note then offered, refused, and the usurious rate agreed on.
So in Young v. Wright, 1 Campb. 139, the agreement was, with the broker, who had been in the habit of discounting for the party at 40 per cent, to have that bill discounted at that rate. But the jury did not believe the witness, and so found for the plaintiff.
The late ease of the King v. Ridge, seems to have settled the doctrine in England, in conformity with the opinions of the majority of the Court in Taylor v. Bruce. There, the drawer himself sent the bill, which had been drawn in his own favor, and accepted and endorsed by Mm *390 alone, into market, by one who was known to the person who discounted it to be the mere agent of the drawer in the negotiation. This person too had been in the habit of discounting such bills or notes for the drawer. It was held to be a negotiation with the drawer himself and the same thing as if he had, on an usurious loan, given his note for the money, with the acceptor as his surety.
I have carefully examined the cases from New York, and especially that of Bennet v. Smith, 15 Johns. 355, in which alone, the question was made, whether it was necessary to prove that the person discounting knew the notes were for accommodation, and made for the purpose of raising money. In most, if not all, of the other cases, such knowledge appeared as a part of the case; and in that case, the jury might well have found the knowledge; for, the application was for a loan, not to sell notes. The party said he would not lend, but would buy notes, and they were afterwards made to the precise amount agreed, and the lender spoke of the transaction afterwards as a loan. Judges are more easily led away in establishing principles, when the case before them is one where, in fact, the principle can work no injury, than when .it is applied to a case, where its hardship and injustice manifestly appears. Besides, the Courts there had, in other cases, laid down the general doctrine, that accommodation notes had no existence until negotiated for value; and that if that negotiation was at a rate greater than legal interest, it was usurious; a proposition undoubtedly true, if, as appeared in those cases, the fact of accommodation was known, and it was also known that the party accommodated was, in person, or by known agent, the party with whom the treaty was. The error was in considering this as a general proposition, without exception; and that it was enough to prove the note to be for accommodation, and to raise money, without further proof of a corrupt loan.
But even in New York, I understand this doctrine is not yet fully settled; nor can it be correct, as it seems to *391 me, unless their statute contaius different provisions in ve» lation to the avoidance of the security, and the punish-meat of the offence,. Even then, it would be a harsh eonstruction, I think, to subject the party to the loss of his money, for a trausaetion, which, if tho note was what it purports to be, would he legal and valid, according to their own decisions, even if tho note was taken from the payee in person.
I must, therefore, be excused for not following the course of decision there, even if it is considered the settled law of that State.
The second proposition presents this question; whether, if a note is made in the ordinary course of business, and is available between the maker and payee, there being no usury between them, but is endorsed and transferred by the payee on an usurious consideration, and afterwards gets into the hands of a bona fide holder for value, this intermediate usury shall destroy the right in the holder to recover on this note against the maker?
The proposition is founded, as I understand, on this argument; that although, as to subsequent endorsements after that of the payee, usury in them shall present no bar, because yon can erase them, and claim to stand at once as the endorsee of the payee, and so this intermediate usury shall not affect the right to recover; yet as you must claim under the payee, and cannot do without his endorsement, that endorsement is void for the usury, and no more title passed thereby, than if it had been forged: that the bill still remains the property of the payee, who could maintain trover therefor, he having still the legal title to the note and its avails; and consequently, that the maker can refuse payment, in fact is bound to refuse payment, if he has notice, as much as he would he, if he had notice of a forged endorsement; and that consequently, the bona fide holder, although he has paid full value, cannot recover.
In the first place, I am not. satisfied that this question arises in this caso. Here the note did not. pass from the *392 payee to the party who advanced his money, unless indeed, the other point is against me; and if it is, this point does not arise in the case; for, according to it, the note itself would be void for usury. The note passed from the payee to Belches. He had the legal title; and it is not pretended, that there was usury between him and the payee. If there was, that again would avoid the note itself for usury, and this question would not arise. Belches was his mere agent, and there was no contract between them, except that he would faithfully perform his agency. He lent no money, and incurred no penalty. Had he even endorsed, it would only have been for accommodation. His principal must have indemnified him. Had he endorsed, the usury would have been between the purchaser and him, and could not have been also between the purchaser and payee, and it is not perceived, how the purchaser can be held as negotiating with the payee, in the one case, when he would not in the other.
If it be said, that he must be considered as negotiating the note with the payee, because there is no other name on it, yet that is repelled by the fact that, in reality, he got it from another, and again, as above said, if it can be considered a purchase from the payee, the note itself is void, not the contract of transfer.
But, as it is-supposed that the question does arise, it becomes my duty to examine it.
The decisions in England have been directly in opposition to each other. The Court of King’s Bench, in the case of Parr v. Eliason, 1 East. 92, Lord Kenyon on the bench (about the year 1800,) deciding in favor of the holder; and the same Court (about the year 1816,) Lord Eelenborotjgh, who had argued the other case when at the bar, being on the bench and deciding otherwise.
The effects of this last decision, on the negotiable quality of commercial paper, was soon felt; and the Legislature, as before remarked, were obliged to interpose.
*393 If this last decision be a sound exposition of the statute of usury, then ours contains the same defect which theirs did; but it will not be for this Court, but the Legislature, to remedy the evil. But my opinion is, that the law is not defective; but that the decision of Parr v. Eliason, is the sound interpretation of the act.
Lord Kenyon, in that case, said, there was nothing in the point, and it might be attended with serious consequences, if it should be supposed that the Court entertained any doubt about it. The commerce of the country subsists on paper credit. If this action could not be maintained, no man could lake even a Bank of England post note, payable to order; for, however legal in its inception, if the payee passed it on usury, it is now contended that it would be void in the hands of an innocent holder. When the, hill itself is usurious, it is void by the statute; and the construction has gone far enough in saying, it shall be void in the hands of an innocent holder without notice. No case has gone the length now contended for; nor do the words of the statute require it. Here the bill was fair and legal in its concoction; and therefore, no advantage can be taken of what happened afterwards, against bona fide holders.
The case of Lowe v. Mazaredo, (the best report of which, that I have seen, is in Cornyn on Usury, 175,) is that in which the contrary decision took place; in which Lord Eei.enbokough said, the bill having been stained by the payee with usury, could never be effective until it was cleansed. Had it been called in by the payee, and republished, it might have received an effect de novo; but tainted as it was, every one must take it subject to its vice. It was impossible to reject one part of an endorsement, and retain another part; but it would be necessary either to receive or repudiate the whole unsound matter. He added, that he had turned the case of Parr v. Eliason in his mind with great doubt; and having been counsel in that case, remembered, that at the time of its decision. *394 there was great conflict of opinion on the subject. That, however, he says, was an action of trover, and the holder of the bill would be entitled to the beneficial consequences arising out of the paper, to recover which trover was the proper form of action. Mr. Justice Bailey said, that as every endorsement was considered in lawa newdrawing, the plaintiffs must necessarily claim under this new drawing, which was usurious. The plaintiffs must here be considered as the substitute of Bloxam,; by which, however, they would not suffer, because it was competent for them to recover against Ambrose, and Ambrose against Bloxam. The other Judges intimated a like opinion.
It seems to me, that the question was decided in this last case, without a due regard, either to the true meaning of the statute, or to the nature of bills of exchange. A note endorsed in blank, is properly .likened to one payable to bearer; and in Peacock v. Rhodes, Doug. 614, Lord Mansfield says, there is no difference between them. ’ Both go by delivery, and possession proves property, &c. It seems to me, that the question does not depend so much on the title passing from the payee, who has endorsed in blank, as on the legal fiction, if I may so term it, by which the holder may claim on the ground of payment of value by him to the payee, and which enables him to strike out all other endorsements, even such as may be in full, and fill up the assignment to himself from the payee. That it does not depend on the title passing from the payee, at the time he parts with possession, is evinced by the cases of lost or stolen notes so endorsed, in which surely no title passed; if possible less so, than when voluntarily delivered on an usurious consideration. But in fact, the moment he voluntarily parted with the possession, the legal title did pass. The holder might have given the note to a friend, and he might have'parted with it for full value, and the purchaser eould recover. If not for full value, still this is usury only with a subsequent holder, and if both had em dorsed, their names would be struck out
*395 .But in truth, is not this using one contract, which is usurious, to avoid or evado the performance of another contract, which is not usurious, though that assurance has been voluntarily sent into the world by the owner, who has thus parted with his legal title, and now seeks to visit the sin of another on an innocent holder, who has given full value for the paper, on the faith that it was legally and properly issued ? It would be a different matter, under the law, if the payee had been sued on this new drawing, as his endorsement is called. Here would be a contract which was corrupt and unlawful; and we would be forced to apply the law in 1ns favor, even against the innocent. This, as Lord Kestyoh says, is as far as the law goes, and far enough too.
But, when we bring this case to the touchstone of common honesty between man and man, how does it stand ? The payee has voluntarily parted with a note endorsed by him in blank, and which is an invitation to all the world to negotiate it. It passes through various hands without farther endorsement, not oven by the usurer himself, so as to make him responsible to any one, unless perhaps, to him he sold it to. The last holder certainly has no recourse against any one whose name is not on it; and if the one from whom he got it was as innocent and ignorant as himself, and did not endorse, he will not bo answerable, as I understand to be settled law. Chitty on Bills, 117, 118. He has advanced his money to the full value of the note; the debt is justly due from the maker, who cannot resist the payment to some one; and the question is, to whom ought it to be paid, according to the principles of common honesty? Is it to be paid to the payee, because usury to the amount even of one dollar has been practised on him, and who will thus receive the money twice, or to the bona fide holder ? If to the payee, then I say this is svjindling, and that under the sanction of a Court of Justice, and worse than the most grinding usury. It is, moreover, to throw the forfeiture of the debt, not on fho usurer, *396 as the law throws it; but, on the innocent holder of the note. This, as Lord Kenyon says, is neither within the letter nor sound construction of the statute. Suppose a man sells or gives his horse to another at an usurious premium for a loan, and he is sold by the usurer to one bona fide; can he recover the horse from the innocent holder because he was passed off on an usurious consideration, and also recover his value froth the usurer ? If this can be done, it will be a more profitable business than usury itself, whilst it will be carried on without risque. But, determine that the innocent holder shall recover from the maker, and let the payee recover the usurious gain from the usurer, and then justice will be done to all, and injustice to none. Neither the spirit nor letter of the statute, in my humble opinion, will justify us in going further. Would a Court of Equity, with all the parties before it, come to this conclusion ? If it would, as it seems to me it certainly would, can it be a sound construction of the statute, to vacate at law what equity ought to enforce, if the parties were before that forum, in a suit by the holder to recover the money, and in which suit usury could as well be pleaded as at law.
As to the third and last head of enquiry; if knowledge in Johnson, that the note was for accommodation, and that Belches was the mere agent of the sellers, must be proved and found, does the verdict sufficiently find that fact, or can the Court infer these facts from those found ?
This knowledge is a matter of fact, as it seems to me, on which the jury alone were competent to decide. They alone could draw the inferences from the circumstances before them. But the verdict, so far from finding that Johnson knew the facts aforesaid, seems to negative even knowledge in the broker himself, that the note was for accommodation. The finding on this point is, “that it was handed to him, without stating what was the consideration, or why it was made, with a request to get money for it. ” So also, instead of finding that Johnson knew *397 at' the agency, it is found, that he, Belches, did not com - muuiuate any thing about the agency, or the intentions of the persons, or the names of the proprietors of the note; and said nothing on the subject, except to oifer the note for sale. We cannot, therefore, it seems to me, infer, that because the jury also find, that Belches, as broker, took the note and sold it to Johnson, they intended to find that he sold it in the known character of broker of the payee. Such a fact, opposed as it is by the other findings, should not have been left to mere inference. Had they been satisfied as to these facts, it is hardly to be presumed that, they would have found a special verdict. It is more probable, that they intended to submit the questions of law which have been above discussed; and particularly whether, as it was a clear case of usury, supposing Johnson cognizant of the facts, is it so, although there is not sufficient proof of the scienter in him, because it is in proof that the note ivas made for accommodation, and intended to raise money on ?
But if it was intended merely to find circumstances, and to refer it to the Court to infer the facts, it, seems to me they were imposing a duty on the Court, which exclusively belonged to themselves. Thus in Lowe v. Waller, Doug. 736, if goods are given in part, above their value, it is the province of the jury to decide, whether the difference is so great, that it is apparent they were taken only as a cover. So, whether the expense and trouble is colourable or bona fide, the culpable intention must always be left open to the jury, whilst the Court are to decide as to the legality of the transaction. Comyn on Usury, 97, 98, 99, 157, 158, 120, 121. In the case of Douglass v. M’Chesney, 2 Rand. 109, although the circumstances were strong, and though that was a ease in Chancery, in what the Court might have determined as to the facts, yet it was considered most proper to refer them hack to a jury to draw the inferences.
*398 The verdict seems to find evidence rather than fact, and if we say Johnson had notice, we only say what we think the jury might have said on that evidence. In the case of -King v. Ridge, it was not considered the province of the Court, to decide as to the fact of notice, but as to the law arising on that fact.
I think there was no error as to the matter stated in the bill of exceptions, and on the whole, am for affirming the judgment.
Judge Cabell.
This was an action by Adams, as endorsee of Wilson Sr Orr v. Whitworth & Yancey, on a negotiable note.
The declaration claimed, as the debt due and detained, the sum of $954 03, with interest thereon from the 13th Nov- 1817, till paid; which said sum of $954 03, was composed of the sum of $ 950, the amount of the note, and the sum of $ 4 03 the cost and charges of protest.
The defence was usury.
The facts of the case are found by a special verdict, which states, “ that the promissory note, in the declaration mentioned, was made by Whitworth Sf Yancey, on the 11th September, 1817, without any consideration having been given, or paid to them by Wilson Sf Orr for the note; but that the note is in due and usual form, purporting to be for value received, and was duly endorsed in blank, by the said Wilson Sf Orr: that on the evening of the 10th September, John Wilson, acting partner of Wilson Sr Orr, sent a verbal message to G. JSf. Belches, a broker in Petersburg, to know whether the names of Whitworth Sf Yancey woúld do, he the said Wilson having, on the same day, asked the said Belches, if he could raise money for him; “ yes, on good paper:” but, the said Belches not being at home, the message was not received by him. That on the said 11th September, the said Wilson delivered the said note to the said Belches, without *399 stating what was the consideration, or why it was made, and requested him to get the money for it; that accordingly the said Belches, as broker, took the said note and sold the same to W\ R. Johnson, at the rate of 3 per cent, a month discount; which discount exeeedéd the rate of six percent, per annum; but, that the said Belches did not communicate to the person to whom he sold the said note, any thing about the same, or the intention of the persons, or the names of the proprietors of the note, and said nothing upon the subject, except that he offered the note for sale; and without farther conversation, the note was purchased as aforesaid. We find that the money paid for the note at the said discount of 3 per cent, per month, was not the money of the said broker, but of the said Johnson, who advanced the money for the said note, at the said discount, without any questions being asked, or information being given by the broker. And if upon these facts, the law he that the said note is usurious or void in law, then we find for the defendant, but otherwise we find for the plaintiff the debt in the declaration mentioned, viz. $954 03, with interest from the 13th Nov. 1817, till paid, and assess the damage to one cent.”
The Superior Court, being of opinion that the law was for the plaintiff, gave judgment for $ 954 03, the debt in the declaration mentioned, with interest from the 13th November, 1817, till paid, and one cent damage, and the* costs: from which judgment an appeal was taken to this Court.
Before wo enter on the consideration of the question directly presented by this verdict, it may be useful to en-quire, whether there be any material difference between the English statutes and ours, on the subject of usury ? If there be no difference, we may, in expounding our statutes, avail ourselves of the decisions of the English Courts, is: expounding theirs.
The most important. English statutes on the subject of usury, are those of the 87th Hen, 8, ch. 9:5th «and fiih Ed *400 ward 6, ch. 20; 13th Eliz. ch. 8; 21st Jas. 1, ch. 17; 12th 2, ch. 13; 12th Ann. ch. 16, and 58th Geo. 3, ch. 93. All these statutes, except the last, are to be found in the Appendix to Comyn on Usury; all of them except the two last, are also to be found in Plowden ori Usury; and the last, as also the statute of Ann. may be found in the last American Edition of Chitty on Bills.
The statute of Henry the 8th, contained no provision for vacating usurious contracts; it denounced and punished the taking and receiving more than 10 per cent, interest. It declared “ that no person or persons, &c. by way or means of any corrupt bargain, loan, exchange, chevisance, shift, interest of any wares, merchandizes or other thing or things whatsoever, or by any other corrupt or deceitful way or means, or by any covin, engine or deceitful way or conveyance, shall have, receive, accept or take, in lucre or gain, for the forbearing or giving day of payment of one whole year, of and for his or their money or other thing, that shall be due for the same wares, merchandizes or other thing or things, above the sum of ten pounds in the hundred, and so after that rate, &c. and no more or greater gain or sum thereupon to be had, upon the pain and forfeiture hereafter in this act mentioned and contained.” A subsequent section declares that “ if any person or persons, &c. shall do any act, &c. contrary to the tenor, form and effect of this statute, &e. every offender, &c. shall forfeit and lose, for every such offence, the treble value, &c.”
The statute of 5th and 6th of Ed. 6th, ch. 20, repealed that of Henry 8th, and prohibited the lending of any sum or sums of money, “for any manner of usury, increase, lucre, gain or interest, to be had, received or hoped for, over and above the sum so lent, &e. upon pain of forfeiture of the value, as well of the sum, &c. so lent, &c. as also of the usury, increase, lucrq, gain or interest.”
The statute of 13th Eliz. ch. 8, reciting the beneficial effects of that of Henry 8th, and the evils of that of Ed. 6th, repealed the latter act, and revived that of Henry *401 Sth, fay declaring “that the said late act, made in the said 37th year of King Henry 8th, &e. shall be revived and stand in full force, strength and effect.” But, as the provisions of the act of Henry 8th, went no farther than to denounce and punish the taking and receiving of more than ten per cent. interest, and was thought to be insufficient for the effectual suppression of usury, the statute of Elizabeth introduced a new provision, in addition to those of Henry 8th, in the following words: “that all bonds, contracts, assurances, collateral or other, to be made for payment of any principal or money to be lent, or covenanted to be performed, upon or for any usury in lending or doing of any thing against, the said act now revived, upon or by which loan or doing, there shall be reserved or taken, above the rate of ten pounds for the hundred for one year, shall be utterly void.”
In the 21st year of James the 1st, it was deemed ad visable to reduce the rate of interest from 10 to 8 per cent. That was accomplished by the act of 21st oí James 1st, ch. 17, which re-enacted, and reduced into one act, the Several provisions of the acts of Elizabeth and of Henry 8th, by declaring, “that no person, &c. from and after the 24th of June, which shall be in the year 1625, upon any contract to be made after the said 24th June, 1625, shall take, directly or indirectly, for'loan of any monies, wares, &c. above the value of 8/. for the forbearance of 100/. for one year, and so after that rate, &c. And that all bonds, contracts and assurances whatsoever, made after the time aforesaid, for payment of any principal or money to he lent, &c. upon or for any usury, whereupon or whereby there shall be reserved or taken above the rate of 81. in the hundred as aforesaid, shall be utterly void. And that all and every person and persons whatsoever, which shall, after the time aforesaid, upon any contract to be made after the said 24th day of June, which shall be in the year of our Lord 1625, take, accept and receive, by way or means of any corrupt bargain, loan, exchange, chevisanee, shift- or *402 interest of any wares, &c. or by any deceitful way or means, or by any covin, engine, or deceitful conveyance, for the forbearing or giving day of payment for one whole year, °f and for their money, &c. above the sum of 81. for the forbearing of 100/. for a year, and so after that rate, &c. shall forfeit and lose for every such offence, the treble value of the monies, wares, &c. so lent, &c.”
It would be-a waste of time to give extracts from the statutes of 12th Chs. 2, ch. 13, and 12th Jinn. ch. 16; which last is now generally known in England as the “Statute of Usury.” It is sufficient to say, that they are almost literal copies throughout from the statute of James, and certainly do not differ from it in any substantial respect; except that the statute of Charles reduced the rate of interest to 6 per cent., and that of Jinn, to 5 per cent.
The statute of 58 George 3d, ch. 93, provides, that “ no bill of exchange or promissory note, thereafter drawn or made, shall, though it may have been given for a usurious consideration, or upon a usurious contract, be void in the hands of an endorsee for valuable consideration, unless such endorsee had, at the time of discounting or paying such consideration for the same, actual notice that such bill of exchange or promissory note had been originally given for a usurious consideration, or upon a usurious contract.”
The first statute in our own Code, against usury, is the act which passed in the year 1730, (4 Stat. at Large, p. 294.) I here copy its provisions, so far as they are applicable to the case under consideration, that it may be seen how exactly it follows the English statute of usury. It declares, “ that no person or persons whatsoever, from and after the 29th day of September, in the year of our Lord 1730, upon any contract to be made after the said 29th day of September, shall take, directly or indirectly, for loan of any monies, wares, &c. above the value of 61. for the forbearance of 100/. for one year; and so after that rate, &c. And that all bonds, contracts and assurances whatsoever», made after the time aforesaid, for the payment of any prin *403 (iipal or money to be lent, or covenanted to bo performed, upon or for any usury, whereupon or whereby there shall be reserved or taken above the rate of six pounds to the hundred as aforesaid, shall be utterly void. And that all and every person and persons whatsoever, which, after the time aforesaid, upon any contract to be made after the said 294i day of September, shall take, accept and receive, by way or means of any corrupt bargain, loan, exchange, chevisance, shift or interest of any monies, wares, &e., or by any deceitful way or means, or by any covin, device or deceitful conveyance, for the forbearing or giving day of payment for one whole year, of or for their money or other thing, above the sum of 6/. for the forbearance of 100/. for a year, and so after that rate, &c. shall forfeit and lose for every such offence the double value, &c.” And this is substantially our present statute of usury. Revised Code, 373.
It will thus be seen, that there is not the slightest substantial difference between our statute of usury and that of England; except as to the rate of interest; and except also that the person taking or receiving unlawful interest, forfeits, by our law, only the double value of the monies, &c. lent, ike.
It has been decided in England, that the statutes of Jinn, of Charles, of James and of Elizabeth, are founded upon the statute of Henry 8th; that they partake of its spirit and expression, and indeed vary little from it, hi any other substantial respect than reducing the rate of interest; and • consequently that the cases decided on the statute of Henry, are lo be taken as authorities applicable to all the subsequent statutes; and that the decisions upon the statutes of Elizabeth, James and Charles, are to be considered as applicable to the statute of Ann. Comyn on Usury, 10; 1 Atkins, 340; 2 Ves. 142.
As our Legislature seems studiously to have copied the very terms of the “ Statute of Usury” in England, 1 have no doubt that it was so done, in order to give us the benefit of the English decisions as applicable to our statute; *404 and I believe it never was doubted that these decisions were applicable, until one of the counsel in the case of Taylor v. Bruce, Gilmer, 42, suggested that there was a difference between our statute of usury, and that of England; a suggestion totally unfounded in fact, as any one may see, who will compare the two statutes.
Haying thus shewn the identity of our statute of usury with that of England, and, consequently, that they both admit and require the same exposition, I will now proceed to lay down some of the general principles, which have been established on the subject, and are supposed to have a strong bearing on the case before us.
The statutes of usury in England, have been always regarded and expounded as penal statutes. , No one ever doubted the penal natui’e of the statute of Henry 8th. Its sole operation was to fix the rate of interest, and to inflict penalties for exceeding it. The statute of Elizabeth revived that of Henry, and was, of course, so far penal; and although it introduced a new clause, yet that also was penal in its nature, since it vacated the contract. The statute of James has no more reference to the statutes of Henry and of Elizabeth, than our statute has. But it incorporates into itself, by particular enactment, all the important provisions of both of those statutes; which provisions were afterwards transcribed and re-enacted in the statutes of Charles and of Ann. as they were also in our act of 1730. All the statutes subsequent to that of Elizabeth have been regarded as penal, not because they were governed by that of Henry, but because of the intrinsic, nature of their provisions.
No difference of construction has ever been admitted between the clause vacating the contract, and that inflicting the penalty for the taking or receiving unlawful interest. In Hamitt v. Yea, 1 Bos. & Pul. 156, where the defence to an action of debt was usury, Brooke, Justice, said “ on a penal statute shall we be so strict, for the purpose of defeating a fair claim; for, I cannot but con- *405 rider the defence in the same light as 1 should a proceeding on the other branch of the statute, and think the present transaction entitled to as favourable a construction as if it were the object of a penal prosecution.” A corrupt intent, a corrupt contract, is equally necessary in both clauses. Ail must agree that it is required by the clause inflicting the penalty; for, it would be monstrous to inflict the penalty of the treble value on the innocent assignee of a contract, in which, although it may have been usurious, he bad no participation, and of which be had no knowledge. And a corrupt intent is equally necessary under the clause vacating the contract. For, the Legislature never thought of vacating, as usurious, a contract which was, in itself, fair and free from usury, but on which a greater rate of interest than the legal rate has been reserved by mistake in drawing the instrument; nor any other contract except where the parties intended to take or reserve more than 6 per cent, interest. And this intention to take or reserve more than 6 per cent■ interest, is all that is meant by the corrupt intent spoken of in the books, as applicable to either clause of the law.
There can be no usury where there is not a loan, express or implied, or at least a forbearance; which, however, is included in the term loan. Comyn, 156-7; Cowp. Rep. 113 14; 1 Vesey, jun’r. 531; Barclay, qui tam v. Walmsley, 4 East, 55. In Barclay, qui tam v. Walmsley, 4 East, 55, Lord Ei.lbnboiiough said, “that to constitute usury, there must either be a direct loan, and taking more than legal interest for the forbearance of payment, or there must, be some device contrived, for the purpose of concealing or evading the appearance of a loan or forbearance, when in truth it was so.”
I3ut, whether there was a loan or not, depends on the intention of the parties to the contract. It is universally admitted, that in enquiring whether a transaction be usurious or not, the principal subject to be attended to, is the intention of the contracting parties, I. do not mean to say, *406 that the parties must intend to commit usury; for, a person may commit it who never heard of the statute. But, no man can be guilty of it, without intending to do the thing which, according to Jaw, amounts to usury. He must intend to do that which, in law, amounts to a loan or forbearance, at a greater gain than the law allows. And in such case, it matters not whether he thought that the transaction was a loan or only a sale; for, whether a transaction, the facts being established, amounts to a sale or a loan, is an inference of law and not-of fact; and his ignorance of the law, shall not excuse him. His guilt consists in intentionally doing the thing which, in reality, is a usurious loan; and therefore, the law infers that he intended to make the usurious loan. This inference of law, is usually made by the jury, whose exclusive province it is, to settle the facts when they are in dispute. Where, however, the facts are found by a special verdict, agreed by the parties, or admitted by a demurrer, the inference of law as to the intention of the parties to lend or to sell, devolves on the Court. Roberts v. Tremaine, Cro. Jas. 507; Chesterfield v. Jansen, 1 Atkins, 301; 2 Ves. 125; 1 Wils. 286; Gibson v. Fristoe, 1 Call, 62; Marsh v. Martindale, 3 Bos. & Pull. 153; Reynolds v. Clayton, 2 And. 15; Mason v. Abdy, 3 Salk. 390; Ballon v. Dunham, Cro. Eli. 642; Stribbling v. Valley Bank, ante. 159. And this inference, whether it be made by the jury or by the Court, must be made from all the circumstances of the case. For it is impossible, in any other way, to arrive at the real intention of the parties. Thus, in the case of Floyer v. Edwards, Cow. Rep. 114, Lord Mansfield said, “it depends principally upon the contract being a loan: and the statute uses the words, directly or indirectly. Therefore, in all questions, in whatever respect repugnant to the statute, we must get at the nature and substance of the transaction: the view of the parties must be ascertained, to satisfy the Court that there is a loan and borrowing, and that the substance was to borrow on the one part, and lend on the other: and. *407 where the real truth is a loan of money, the wit of man cannot find a shift to take it out of the statute.” The same great Judge said, in Lowe v. Waller, (Doug. 738,) 44 the jury were to consider whether the transaction was not in truth a loan of money, and the sale of goods a mere contrivance and evasion. He then stated the material parts of the evidence, and made some strong observations to shew that it, was nol the. intention of the parties to buy and sell, but to borrow and lend; and that the contract was in truth a loan of money, though under the mask of a treaty for the sale of goods.”
But, before we attempt to apply these principles to the ease before us, it will be necessary to ascertain the facts established by the verdict.
It sufficiently appears, that the note in question was made by Whitworth 4' Yancey to Wilson 4' Orr, without consideration, and solely for the accommodation of W. fy O., the payees, to be sent into the market for the purpose of raising money; and that it was, for that purpose, put by W, 4* O. into the hands of a broker, who sold it to Wm, 12. Johnson, at a discount greater than legal interest. But whether Johnson, at the time he made the purchase, knew that the note had been made without consideration, and was offered for sale by the broker, for the benefit of W. 4* O., the payees, is a matter of fact, which is not found by the jury. Whether the jury ought, from the other facts found by them, to have inferred and found the farther fact, that Johnson had such knowledge; or whether, if the facts actually found, had been presented to the Court by a demurrer, the Court ought to have inferred the farther fact, that Johnson had such knowledge, is a point not necessary to be decided. I will observe, however, that if I had been on the jury, I should have done as they have done; I could not have said, on my oath, that Johnson had such knowledge. How could they have said so, in the absence of all evidence on the subject ? The broker himself had no reason to know that, the note, had been given for the :v *408 commodation of TV. fy O., by whom he was employed to sell it. He received no such information; and although it very frequently happens that one man endorses for the accommodation of another, it does not often occur that he gives his own note, and thus represents himself as the debtor, solely for the aecommodation of another. But, even if the broker knew it, how could Johnson know it ? It is expressly found, that the broker made no other communication to him than that he offered the note for sale. Do brokers sell none but accommodation paper ? And if it had been real paper, given in the ordinary course of business, yet as it had been endorsed in blank by TV. &O., how was Johnson to know, without information, that it was still their property ? It might have passed into other hands since their endorsement. Knowledge of these facts, by Johnson, would have had an important influence on the cause. Knowledge by him, that the note had been made for the accommodation of TV. fy O., and was offered for sale by the broker for them, would have had a decisive influence on the cause; for, every body admits, that a purchase by him under such circumstances, at a greater discount than legal interest, would be usurious and void; for it would be, in truth, a loan, at usurious interest, disguised by the mask of a sale. The jury had a right to find this fact, and it was their duty to have found it, if they thought the evidence justified it. Their omission to find it affords a strong presumption, that they were not satisfied of its existence. And the acceptance, by the plaintiff, of a special verdict which did not contain it, affords a strong presumption, that even he was not satisfied that it ought to have been found. But, it is useless to press this point farther; for, whatever the jury might have done, or ought to have done, we must take the special verdict as we find it; and as Judge Greek said, in Stribbling v. Valley Bank, ante. 159, £iitis an inflexible rule that the Court upon a special verdict, cannot infer other facts from those found.”
*409 We are, therefore, to consider the case arising on this special verdict, as the naked case of an accommodation note, made for tho purpose of raising money, put by the person for whose accommodation it was made, into the hands of a broker, and sold by him, at a discount greater than legal interest, to a person ignorant of the character of the note, of the purpose for which it was made, and of the person for whose benefit it was sold. And, viewed in this aspect, it is precisely the case of Taylor v. Bruce, Gilmer, 42. It was decided in that case, by two Judges against one, that the sale under such circumstances, was a real, bona fide sale, and not a shift or cover for a usurious loan. But, as the Court which decided that case was a bare Court, consisting of three Judges out of five, and was divided, that decision has never been considered as settling the law, and is now to be re-viewed.
I did not sit in the case of Taylor v. Bruce, because it was supposed that the principle involved in it, was applicable to a case in an inferior Court, in which I was then a party. But that case has been, long since, decided in my favor, on other grounds; and the controversy forever terminated, by the refusal of a supersedeas to the unsuccessful party. The interest which I was supposed to have had In the decision in Taylor v. Bruce, if it could have had any effect on my feelings, would have inclined me to wish a decision different from that which was pronounced. But, that interest has certainly left no bias on my mind; for, after a laborious, extensive and careful examination of all the principles and authorities supposed to have any bearing on the subject, I entirely approve of the decision of tho Court.
Our laws having put notes negotiable at bank, on the footing of foreign bills of exchange, this case must be decided by the principles applicable to such bills.
It is one of the privileges of a bill or note, that it imports a full and fair consideration; and it is consequently *410 not competent to any party to it, to allege the want of consideration, as against any person who has given value for it
If a bill be, by its terms, payable to a particular person or bearer, it is transferable by delivery. If it be payable to the order of a particular person, or to him or his order, &.c it is transferable, in the first instance, only by endorsement. The endorsement of a bill or note may be either in full, that is, in favor of some particular person; or it may be in blank; that is, by the mere signature of the party making it. After an endorsement in blank, the bill or note is transferable by mere delivery: and so long as the endorsement continues in blank, it makes the bill or note payable to bearer. An endorsement in blank, even if made for a particular purpose only, or without intention to transfer it at all, puts it into the power of any person into whose hands it may come, either by special trust, by finding, by fraud or by theft, to transfer the bill or note, in the same manner, and as effectually, as if it had been, originally, made payable to bearer. And it would not be competent, in any such case, to any party to the bill, or note, to object to its payment. The holder of the bill or note, is the owner, as to every person to whom he may pass it for value. I do not understand this to be contro» verted, except as to those cases where the seller is, in truth, the agent of the endorser of the bill or note, or the agent of that party to an accommodation bill or note, for whose accommodation it was made; and where, in either case, the payment is resisted on the ground of usury.
Bills of exchange and negotiable notes are property; and they are as much the subject of sale as any other property. And the mere circumstance of their being sold at a discount greater than legal interest, does not subject the sale to the imputation of usury, unless it be made in such a way as to make the seller responsible for their nominal, amount, in case of their being dishonored. If, therefore, the holder of a bill originallj' payable to bearer, or of a note or bill endorsed in blank, (which makes it payable to bearer,) sells it, at ever so great discount, iC out and outJp *411 (.that is, solely on the credit of the other names upon it, which implies that he neither endorses it himself, nor makes any other engagement to be responsible for it, in ease of its dishonor,) such sale cannot he impeached on the ground of usury, any more than if it had been the sale of a horse at a price less than his value. And I do not understand that this is denied, as to any case, where the bill or note was originally for value, and where the sale is not made by one who was, in fact, agent for him who endorsed it. But. it is contended that if ihe bill or note was originally for the accommodation of one of the parties to it, and was sold at a discount greater than legal interest, by a person who was agent for the party for whose accommodation the bill or note was made,, it is void for usury; whether the purchaser knew, or did not know, the character of the note, or that it was sold for the benefit of him for whose accommodation it was made: and .this brings us to the great point in the cause.
I have already stated that, if the purchaser knew the character of the note, and that the person soiling it was the agent, of the party for whose accommodation it had been made, and purchased it, with such knowledge, at a discount greater than legal interest, it would be void for usury. And this was admitted by both of the Judges who decided the case of Taylor v. Bruce. It would be usury, because, the purchaser, knowing the facts above mentioned, could stand in no better situation than if he had purchased the note directly from the principal. Dealing with a known agent, is dealing with the principal. And if the purchase had been made directly from the principal, it would be clear usury; because, the note being merely for accommodation, was not, as between the parties to it, the evidence of any subsisting debt. It was, consequently, as to them, not an available note, nor could any action, as between them, be maintained upon it. It has no legal existence until it is negotiated for value. And if it bo negotiated directly by the party for whose accommodation it was *412 made, to a person acquainted with the facts of the case, on a contract to receive for it less than its nominal amount, discounting the legal interest, it would not differ in any substantial respect from the present advance of money, on a contract, that in consideration of the advance, the person receiving it, should give his obligation to the party making the advance, to pay him at a future day, a sum greater than the sum received and legal interest. This last transaction would be a direct loan at illegal interest; and as the negotiation of the note, under the circumstances supposed, does not substantially differ from it, the law infers that the party really intended a usurious loan, and resorted to the sale of the note, as a shift or device to conceal it.
But how stands the law, if, as we are forced to say was the fact in the present case, the purchaser of the note did not get it, from the party to the note, but from a broker in the market, without knowledge of the character of the note, and without knowledge of the person for whom it was sold ?
By the law merchant, which has, by adoption, become a part of the common law of the land, every bill of exchange imports, as before said, a fair and full consideration; and if it was originally made payable to bearer, or has become so payable, by having been endorsed in blank, every bearer or holder, be he agent, trustee, finder or thief, has a right to sell it, and to transfer it, by delivery. In no case whatever, is the person disposed to purchase it, bound by the law to make any enquiries as to the right by which the bearer or holder sells it; nor, after he has purchased it, can his right to demand and receive its amount from all the parties to it, be objected to on the ground that the person who sold it, exceeded his authority, violated his trust, or that having only found or stolen the bill, he had no title to it. To compel the purchaser to go into enquiries as to the consideration, or to permit the parties to the bill to object to its payment, on any of the grounds stated, would greatly impair the negotiability of bills and notes; their most dis- *413 anguishing, most useful, and most valued feature. Surely, therefore, a person purchasing such a bill from the holder or bearer, must regard him as the owner, and deal with him as the owner, even if he be a broker; unless, indeed, he had actual notice of the real owner And if the purchase of an accommodation bill or note, be made in ignorance of the character of the note, and of the person who is the real owner, aud be made at a discount greater than legal interest; on what principle can it be said to be a loan, express or implied; without which, we have already seen, there can be no usury ? If it be a loan, there must be a borrower as well as a lender. To whom was the loan made; who was the borrower in this case ? Every loan implies, necessarily, an obligation on the borrower to return the money received. But, it must he confessed that, in this case, the transaction imposed no obligation on Belches, the broker, to return the money he received, nor to be liable for it, in any event, or in any manner whatever. Nor did any of the parties intend that he should be so liable. The parties could not, therefore, have intended a loan and borrowing, so far as respects the broker.
But, it is contended, that it was a loan as to Wilson fy Orr. In the case of Floyer v. Edwards, Douglass, 114, Lord Mansmeib said, ‘1 that the view of the parties must be ascertained, in order to satisfy the Court that there was a loan and borrowingBut, how is 45 the view of the parties to be ascertained?” From the fads of the transaction, as they were exhibited, and appeared to the parties, at the time. It is on this principle, that the purchaser of an accommodation hill or note, at a discount greater than legal interest, from the known agent of the party for whose accommodation it was made, is held to be usurious. In such a case, the facts of the transaction, as they appear to the purchaser, make known to him that he is advancing his money to the very man whose bill or note he gets, and that the bill or note had no legal obligation whatever, until he received it. The substance and nature of such a transaction, *414 is nothing more than a loan, at more than legal interest, and the bill or note a security for it; and that was the real intention of the parties. If the facts of the transaction, as they appeared to the parties at the time, are to be examined, for ascertaining “the view of the parties,” in order to satisfy the Court that the transaction was, in its “ nature and substance,” different from the form which they have given to it, surety the same examination should be made for ascertaining “ the view of the parties,” in order to satisfy the Court that the transaction was, in its “ nature and substance,” that which its form indicates. Applying this test to this transaction, the question as to a loan to Wilson 8? Orr is at an end. Johnson saw a note importing full consideration, and payable to bearer, in the hands of Belches, a broker. He knew that Belches, as holder or bearer, had the right to sell it, and to transfer it by delivery; and that any person had the right to purchase it from him as holder, at any price that might bo agreed upon, provided Belches did not make himself liable to return a greater sum than the sum received, and legal interest. Wilson 8? Orr appeared not in the transaction. Johnson knew not that they had any interest in it. How, under such circumstances, is it possible that Johnson, in exercising an acknowledged right to purchase the note which Belches had an acknowledged right to sell, intended to lend to Wilson 8? Orr, the money which he paid to Belches as the price of the note ! If the circumstances of a transaction may be resorted to for ascertaining the “ view of the parties,” (and it is certainly a most legitimate source,) Johnson intended not to lend his money, but to buy a note. And, therefore, the transaction is untainted with usury; for, as has been said before, there can be no usury where there is no loan. I do not mean to say that if Johnson intended to do that, which, in law, amounts to a loan, his belief that it was a purchase and not a loan, would prevent its being considered a loan. Ignorance of law never excuses. As for example, if A wish *415 ing to raise money, were to make his note payable to />', and then go to B, and offer to sell it to him, and B, supposing that a man might lawfully sell his own note, were to give the money for it, verily believing that he was purchasing a note, and not lending his money on the security of a note; this would unquestionably be a loan, on the ground that he had intentionally done that which the law makes a loan. And this intention, would, if the note were taken at too high discount, be a corrupt intent, sufficient to vacate the contract under the first clause of the law, and to subject him, criminaliter, to the penalty, under the second clause, if the usurious gain were received.
The argument generally relied on, in support of the proposition that the discounting an accommodation note at a greater premium than legal interest, makes the note usurious and void, is usually stated in the following form; “as none of the parties to the note could maintain an action on it, as among themselves, it was not an available security until it was discounted; and if the discount which thus gave it being, was at a premium greater than legal interest, the note is usurious and void.55
It is certainly true that accommodation paper is utterly ’unavailable as a security for money, until, (in the language of Chief Justice Abbot,) “it is issued or negotiated to some real holder for valuable consideration;” or until, (in the language of Justice Bailey,) “ ii is issued to some person who can make a valid claim upon it.55 Downes v. Richardson, 5 Barn. & Ald. 674; 7th Com. Law Rep. 227. The term “negotiation,55 when applied to a bill or note, includes, as 1 understand it, every mode of transfer, whether of sale or discount,, by endorsement or delivery. It is admitted, therefore, that the note in question was never an available security, until it was transferred to William it. Johnson, at a discount of three per sent. per month. But it docs not, in my humble judgment, follow, that the note is, therefore, usurious and void. It h rather, (I say it with great deference,) an assump *416 tioa of the very point in controversy, and which is required to be proved. The note was unavailable before it was negotiated for value. But whether the note was valid and available afterwards, or void for usury, depended, not upon the rate of discount, but upon the character of the negotiation as a contract of sale, or a contract of loan. If the negotiation was a contract of loan, then, if the rate of discount was higher than the legal rate, -the note would be usurious and void. But, if the negotiation was a contract of sale, (i out and out,” that is, on the sole credit of the names already on the note, the sale was valid, whatever was the rate of discount; and the note is a valid and available security in the hands of the purchaser. For, by the rules of the law merchant, every bill imports a consideration not to be questioned, in the hands óf a purchaser for valuable consideration; every endorser in blank, of a bill of exchange, even if the bill was an accommodation bill, makes it, thereby, payable to bearer, and enables a purchaser for valuable consideration, to deal with him as owner; and the holder may, consequently, transfer it, by delivery, to such purchaser, in the same manner, and as effectually, as if he were the owner of the bill, and as if the bill had been originally given for full value. Therefore, the mere circumstance of the bill having been transferred for less than its nominal amount, deducting legal interest, is no objection to the validity of the bill; unless the case can be brought within the statute of usury. But, that statute applies to those cases only where the transfer was made under such circumstances that the law considers the transaction a loan, and the bill a mere security for the loam and I refer to a former part of this opinion, where I endeavoured to shew, that the purchase of an accommodation note or bill, at a greater rate of discount than legal interest, even from the agent of the person for whose accommodation the note or bill was made, is a real purchase, and not a loan; provided the purchaser did not know the character of the note or bill, nor that the person with whom he dealt. *417 was the agent of the person for whoso benefit the note or hill had been made.
Bat, it is said, that the ease of a security avoided by the statute of usury, is an exception to the rules of the law merchant; and that, therefore, the rules of the law merchant, do not apply to a case where the defence is usury.
I readily grant, that the statute of usury does constitute an exception to the rules of the law merchant, and that so far as the exception extends, (but no farther,) the rules of that law do not apply to cases where the defence is usury.
But, how far does the exception extend ? To determine this, we must first ascertain the rule, and then the exception. By the law merchant, it was not allowed to a party to &, bill, to object, as against a purchaser for value, the want of a consideration; nor was it allowed to him to object, ay against any body, that, the bill had been given for a usurious consideration. Tima stood the law merchant until the statute of Elizabeth avoided all contracts founded on a usurious consideration. But, the statute made no other change in the law merchant, and of course, constitutes no farther exception to it, than lo allow the party to a bill, to object, as against every body, that the bill had been given for the illegal consideration of usury, and was therefore void. I admit, however, that the statute having allowed him to plead the usury in bar, it allows him also to give evidence of every fact that will conduce to prove the usury. Thus, where the hill was an accommodation bill, and was sold by the agent of the party for whose accommodation it was made, the defendant will be allowed to prove both the want of consideration, and the agency of the broker, in all cases where those facts will conduce to prove the usury; as, for example, where they were known to the person purchasing the bill. In that case, they do conduce to prove the usury; because, they prove that his real intention was to lend his money, and not to buy a bill, in the way of trade. But, where those facts do not eon *418 duce to prove the usury, they will be excluded; as, for pxample, where the agency and the want of consideration were unknown to the purchaser. In such case, they do not conduce to prove the usury; because, the question, whether usury, or no usury, depends upon the intention to lend: and it is impossible that a man’s intention can be proved, in the slightest degree, by facts of which he had no knowledge.
I have not been able to find a single case, in any English Court of Justice, where the transfer of an accommodation bill has been decided to be usurious and void, merely on the ground that it was transferred by the agent of the party for whose accommodation it was made, at a discount greater than legal interest. There has not been a dictum to that effect; so far, at least, as I have observed. Knowledge in the purchaser, of the character of the bill, and of the agency of the seller, are considered in England, to be indispensable requisites, to constitute usury in such cases. On this point, the case of The King v. Ridge, 4 Price’s Reports, 50, is an express authority, directly in point. The arguments of the bench and bar appear to me, to throw much light on this question, so much controverted in Virginia. Considering the case as very important, and entitled to great respect, and, as the book containing it is very dear, and very rare, (I have not heard of a copy of it in any library or in any book-store in Virginia,) I shall request our reporter to publish the case at large, in a note, or in his Appendix, from a manuscript copy which I obtained from Philadelphia, through the agency of a friend, and which, I believe to be correct. I forbear, therefore, to make any farther remark upon it.*
As to the cases of Dagnal v. Wylie, 2 Campbell, 33; Jones v. Davison, 1 Holt, 256; 3 Com. Law Rep. 92; Young v. Wright, 1 Campbell, 139, and Ackland v. Pearce, 2 Campbell, 599; I have examined them with *419 great attention; but I can perceive nothing in the grounds on which the Judges themselves put their decisions, caleulated in any manner, to shake my confidence in the eiples on which the cases of The King v. Ridge, and Taylor v. Bruce, were decided.
It is true, that the great principle, involved in this case, has been settled in New Fork, differently from The King v. Ridge, and Taylor v. Bruce. I have very great respect for the decisions of the Courts of that State, and generally, I derive profit as well as satisfaction from consulting them. I have considered all their cases upon this point, but have not been convinced by them. And, great as is my respect for them, I cannot sacrifice to them the convictions of my own judgment; backed as they are by the uniform decisions of the English Courts.
My brother Judges have discussed at great length another question, which is this; If the note in this case could be regarded as an available security, as between the parties to it, and had been endorsed, at a discount greater than legal interest, by the payee, to a person who afterwards transferred it to a bona fide holder, could such holder recover on the hill ?
This question, although made, does not judicially arise in the case. The note did not pass from the payee to the person who paid the money, nor was there any contract of endorsement between them. But if, as the question supposes, the note had passed from the payee to the person who paid the money, on a contract of endorsement, by which the payee received, for the bill, less than its nominal amount, deducting legal interest, I should be decidedly of opinion that the endorsement was usurious and void, on the ground mentioned by Bailey, Justice, in Lowes v. Mazaredo, Oomyn’s Usury, 181, that “every endorsement is considered in law as a new drawing.” And as every holder subsequent to the payee, must claim through the endorsement of the payee, he could not, if that were void, recover on the bill. This point was settled in *420 Lowes v. Mazaredo; and I entirely approve of that decisión. My brothers Carr and Green, have taken extern sive views of this point, in which I concur.
I think the judgment should be affirmed.
The President.
It is somewhat to be regretted, that the point decided by this Court, in the case of Taylor v. Bruce, Gilmer, 42, upon two very elaborate and able arguments by the bar, is to be re-viewed in this case, in which there has been no argument, there being no counsel on either side. Under these circumstances, I might content myself by referring to my opinion in that case; an opinion formed on as much light as I have now before me, and upon as laborious and deliberate consideration as I am capable of devoting to any ease. I shall, however, without pretending to enter into a very elaborate discussion of all the cases that are supposed to have any application to it, confine myself to a few remarks on the principle, on which the case to be re-viewed was decided, and to the few cases really applicable to if.
It must be admitted, I think, that a note, such as those in the case alluded to, and the one in the case before us, in the hands of a party who was the legal owner of it, as regarded the purchaser, might be purchased for less than its face, without the imputation of usury; and that the parties to it would be estopped, by the law merchant, to say, in a suit upon it, that it was without consideration, or tainted with fraud. The negotiable character, imparted to it by the law merchant, it must be admitted, forbids such defence. Upon these premises, the first question in the ease of Taylor, &?c, v. Bruce, was whether, though in fact the notes in that case were made to raise money on, the defendants could avail themselves of the plea of usury, against a party totally ignorant of the purposes for which the notes were-made, and who had paid value for them; whether the policy of the act against usury must not only *421 prevail over the policy of the law merchant, but was so strong as to subject a party to all the consequences-of com-miring usury, in the absence of all proof, that he was teutionally guilty; a proceeding, directly opposed to the spirit of our laws, and reprobated in all trials for the breach of them.
In considering that question, though it was admitted upon principle and authority, that a contract, usurious iu its inception, must be held to be void in tho hands of a fair holder, as against the parties to it, yet it, was thought by a majority of the Judges, that in a ease in which the usury was not consummated before the sale of tho note, its negotiable character, in the first, instance, ought to protect it from the plea of usury; and the more especially, if the allowance of the plea would subject & party to all the consequences of committing usury, though totally ignorant of it at the time he purchased the note. Many cases were cited by counsel in that case, and some of the New-York cases much relied on. Upon the Brut argument, there was no division in the Court, on the law of the case, But on the fact, the dissenting Judge believed, on the evidence, that Bruce,, the purchaser of the notes from the broker, liad notice of the purpose for which they were made, and that he was pm chasing from the makers; and on the second argument, which is reported, it is very evident that that impression had great weight in bringing hist: to the conclusion on the law, to which he finally came.
As regards Johnson, who purchased the note of the bro - ker in this case, if he had knowledge of She purpose for which it was made, it ought to have been found by the jury. On the contrary, I think ignorance of the purpose for which this note was made, sufficiently appears by tin-verdict. If any thing was to be inferred from the Gu:tf that Belches, who sold the note to him, was a genera! broker, which is found by the jury, or from any other fact in tho verdict, to fix the fact of knowledge of the purpose for which, the note was raade, upon him, it. ought to have beet- *422 found by the jury. On the contrary, the express finding that no questions were asked, and no information given, negatives, if it were necessary, any knowledge in Johnson¡ °f the purpose for which the note was made.
As regards the purchase by Johnson, then, the question is precisely the one decided in the case alluded to. In a contest between the policy of the law against usury, and the policy of the law merchant, which gives to bills their negotiable character, a defendant ought not to be permitted to avail himself of usury, as a sword by which to injure others, as in the case of Taylor, <$-c. v. Bruce, (for in that case it was in evidence, that real bona fide notes might have been purchased at a rate not higher than the notes in question,) but as a shield with which to protect himself against the extortion of his adversary. The rule caveat emptor does not apply to bills and notes, because their title is on their face; their negotiable character absolves the purchaser from all enquiries beyond the paper itself. They are not affected by failure of consideration, or by fraud, in the hands of a fair purchaser without notice. A bill or note with a blank endorsement, is a bill or note payable to bearer, and passes by delivery. In the case of Lowe v. Waller, in which there was usury in the concoction of the bill, the Court, to preserve the principle of negotiability, struggled hard, but was compelled to yield to the force of the statute against usury. In the case of Parr v. Eliason, Lord Kenyon held, that intermediate usury, between an endorser and endorsee, did not taint the contract with usury in the hands of a bona fide holder. In the case of Lowes V. Mazaredo, Lord Ei.lenborough overruled that case, and in consequence of it, such was the shock given to the negotiability of bills, that the act of 58 George 3, was passed, to re-establish public confidence in bills, &c. That act declares, that no bill of exchange or promissory note, though for usurious consideration, shall be void in the hands of an endorsee for value, unless at the time of his discounting it, or paying the consideration, he had actual notice of *423 s,he usury. This act reverses the decision of Lowe v. Waller, and excludes negotiable paper, almost, entirely, from the operation of the statule against usury. This act, it is true, is not in force in this country, and is only cited to shew the state of the contest in England, to sustain the negotiability of bills, against the policy of the law against usury.
The only case I have met with, which is directly in point to the case before us, is the case of The King v. Ridge, 4 Price’s Rep. 50. The facts were, that Lord Moira drew four bills of exchange, payable to his own order, which were accepted by Ridge, his Lordship’s regimental agent. They were endorsed generally by Lord Moira, and by his agent, Major James, handed to the house of Jiustin <§'• Maund, who discounted them at usurious interest. The real question in that case was, whether it was a sale of the bills, or a loan; and it was decided to be the latter, on the express ground that Jiustin Maund, who discounted them, must have known that they were dealing with Lord Moira himself for the bills, and not with another, who might be the owner of them. Among others, Gakjiow, Baron, said, the confusion which has got into this case, proceeds from its having been at one time considered, that these bills were sent about the town, to be sold for what could be got for them; but the fact is, that this paper was sent by the maker to those, who well knew its precise value, to get that value for it, which was done. Nothing had been given by Major James for it; and whether the transaction was originally good, it is not necessary to enquire. But that this transaction, as between Major James, the acknowledged agent of Lord Moira, and Jhtstin # Maund, was usurious and void, there can be no doubt. That it was nothing but a loan by Jiustin 8? Maund to Lord Moira, seems, from the facts, very clear. But, if they had not known, that the bills were the bills of Lord Moira, and sent by Major James, his agent, to borrow money on them, it is equally clear the decision would *424 have been a different one. If, as in the case of Taylor, #e. v. Bruce, they had been sent about the town, to be sold, (as for all that appeared in that case they were,) and Jlustinfy Maund had been totally ignorant to whom they belonged, as Bruce was, it is impossible to perceive that the transaction would have been condemned as usurious; unless, indeed, in no case can a bill or note be sold for less than its face, without subjecting the purchaser to the consequences of committing usury.
As to the cases in which a party purchasing a contract, usurious in its inception or concoction, though ignorant of the usury at the time, is to lose his money, they are not controverted. They have no application to the case before the Court. In such cases, he is not condemned as an usurer, though he loses his money. The usury exists anterior to his purchase, and is not consummated by his purchase. But even in these cases, it will be found, that before the passage of the act of 58 Geo. 3d, there was great repugnance in the English Judges, to subject an innocent purchaser of such a bill, to the loss of his money. In the case of Jones v. Davidson, Chief Justice Gibbs said, “I can never understand the equity of the rule, which has so long obtained under the statute, that an innocent endorsee shall be prevented from recovering on a bill of exchange, which has been contaminated in its creation with usury, by means to which he is not privy, and of which, when he receives the bill, he can know nothing. I own I have sei’ious doubts on this construction; and if the case renders it necessary, I Will reserve the point, except for usury committed by the parties who originally create the instrument. If the parties who create the instrument, and agree to put their names upon it, commit usury, it is reasonable that they should answer for the consequences; but, I do not' understand, why the security should be avoided in the hands of one who takes it for a valid consideration in the common course of business.” In that case, ¿a agreed to give B, a sum beyond legal interest, to get a bill discount *425 ed. 0, discounted it at legal interest, and B, endorsed it. Held, that Jl, could not defend himself against the endorsee of C, on the ground of usury between him and B.
These cases, as before remarked, have no application to the one before us. There is an important difference between convicting a party of usury, and subjecting him to the loss of his money, by the conviction of others. In order to convict a party of usury, the intention to commit it must be wilful. There must be a corrupt agreement, and not a true and just intent. In a contract, fair upon the face of it as to himself, he cannot unknowingly, be made the instrument of others to commit it; unknowingly, not as to the law, but the facts, on which he proceeds to advance his money. The technical distinction between what is called a perfect bill and a blank, ought not to affect him; but in truth, there is nothing in it. A note made by H, and endorsed by B, for accommodation, though of no binding force between the parties until discounted, is not a blank piece of paper. As regards évery body else, it is a binding security, and when sold to a party without notice, neither want of consideration, nor fraud, ean be alleged against the holder. To allege usury in the purchaser who discounts at more than legal interest, though real business notes might be purchased at the same or less discount, according to circumstances, and to subject him to the penalty of usury, would be to interdict the sale of bills and notes altogether, or to put him on enquiry, which would change the character of such paper. Nor can this Consequence be avoided by any construction of the act against usury.
It cannot be said, that the contract may be avoided under the first section, and the party remain unaffected by the second section, if he receives its amount. The two sections must be taken together, to give any validity to the second. It must be considered as applying to the party embraced by the first. That section avoids the contract if usurious; and the second inflicts the penalty, if the usury *426 is received. The first subjects him to the charge of having made a corrupt contract; and the second inflicts the penalty. Corrupt intention is required in both parties. Price v. Campbell, 2 Call, 11. That it is a legal inference from the facts, and need not be found by the jury, is admitted.
Upon the whole, I think the case of Taylor, &c v. Bruce, was decided on correct principles, and that the case before us must follow its fate, and the judgment be affirmed.
Judgment affirmed.*

 Note.™The statute here referred to, is 58th Geo. 3d, ch. 93, which provides, that no bill of exchange or promissory note, though given tor an usurious consideration, shall be void in the hands of an endorsee for value, unless, at the time of his discounting or x»ayiug the consideration of the same, he had actual notice of the usury.

 See Appendix, No. 2.

 Note.—The judgment was afterwards reversed, on account of interest being given on the costs of protest.